IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
October 4, 2006 Session Heard at Nashville

**IN RE ADOPTION OF A.M.H.**

**Appeal by Permission from the Court of Appeals, Western Section**
**Chancery Court for Shelby County**
**No. CH-01-1302-III     Robert L. Childers, Chancellor by Designation**

————————

**No. W2004-01225-SC-R11-PT - Filed on January 23, 2007**

————————

This case concerns the termination of parental rights. The appellants, who are the parents, seek reversal of the termination of their parental rights to the care and custody of their daughter, A.M.H. The trial court predicated the termination on the ground that the parents abandoned A.M.H. by willfully failing to visit her for four months. First, we hold that the statute of repose under section 36-1-113(q) of the Tennessee Code Annotated does not deprive this Court of jurisdiction to review the termination of parental rights. Second, because the undisputed evidence shows that there was animosity between the parties and that the parents were actively pursuing custody of A.M.H. through legal proceedings during the four-month period immediately preceding the filing of the petition for termination of parental rights, we hold that the trial court erred in finding a willful failure to visit. Finally, we conclude that the parents' consent to transfer custody and guardianship of A.M.H. to the appellees was not made with knowledge of the consequences of the transfer. Therefore, according the parents those superior rights to the custody of their child that constitutional law mandates, only a showing of substantial harm that threatens the child's welfare may deprive the parents of the care and custody of A.M.H. Although A.M.H. has now been with the appellees for more than seven years, six of those years elapsed after the parents' first unsuccessful legal filing to regain custody. Evidence that A.M.H. will be harmed from a change in custody because she has lived and bonded with the Bakers during the pendency of the litigation does not constitute the substantial harm required to prevent the parents from regaining custody. For the reasons discussed below, the judgment of the Court of Appeals is reversed, and this case is remanded to the chancery court to be expeditiously transferred to the Juvenile Court of Shelby County for the entry of an order that implements a plan to reunite A.M.H. with her natural parents.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed;**
**Case Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., and ADOLPHO A. BIRCH, JR., SP.J., joined.

David A. Siegel, Memphis, Tennessee, for the appellant, Shao-Qiang ("Jack") He.

Richard A. Gordon, Memphis, Tennessee, for the appellant, Qin ("Casey") Luo.

Larry E. Parrish, Memphis, Tennessee, for the appellees, Jerry L. Baker and Louise K. Baker.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; and Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for the appellee, State of Tennessee.

Christina A. Zawisza, Memphis, Tennessee, for the amici curiae, University of Memphis Child Advocacy Clinic, Loyola University Childlaw Center, Vanderbilt University Legal Clinic, and Tennessee Alliance for Legal Services.

Linda L. Holmes, Memphis, Tennessee, for guardian ad litem, Kimbrough Mullins.

**OPINION**

*Facts and Procedural History*

The parents of A.M.H. are citizens of China. Prior to the child's birth, her father, Shao-Qiang ("Jack") He, was a tenured college professor in China. He moved to the United States on a student visa in 1995 to attend Arizona State University. In 1997, he enrolled in an economics doctorate program at the University of Memphis and was awarded a scholarship and a graduate assistant position with a stipend. The mother of A.M.H., Qin ("Casey") Luo, although unmarried, obtained a visa as the father's wife. The mother arrived in the United States on June 30, 1998; the parents did not marry immediately. The mother speaks little English and has used an interpreter throughout these proceedings.

The mother became pregnant in July of 1998. Soon after, a student at the University of Memphis filed a complaint with the university alleging that the father had attempted to rape her. Although the father consistently denied the allegations and was eventually acquitted by a jury, this charge had severe consequences. Because of the charge, the father was terminated from his graduate assistant position in October of 1998. With no job or stipend, the parents had very little income and no health insurance; in late 1998, they decided to meet with a birth-parent counselor at Mid-South Christian Services (hereinafter "Mid-South"). At the trial of this termination petition, the birth-parent counselor from Mid-South testified that the parents initially expressed a desire that their unborn child be adopted by a financially stable family. The father testified that the parents were seeking social services when they went to Mid-South and did not ask to place their child for adoption. This is consistent with the testimony of the Mid-South counselor, who testified that she discussed with the parents placing A.M.H. in foster care through the Tennessee Department of Children's Services but advised against this option because of the potential "risks" and "difficulties." The Mid-South counselor testified that she told the parents, "once the child went into the care of the State, the child could be there for a long time" because "there are certain things that have to be in place before [the Department of Children's Services] returns the child to the biological parents." The father further testified that the parents agreed to consider adoption as an option at the counselor's

suggestion. On December 1, 1998, the parents met with a couple interested in adopting a child through Mid-South.

On January 28, 1999, A.M.H. was born. Shortly after the birth, the mother told the Mid-South counselor that A.M.H. was not to be placed for adoption. The hospital records verify that A.M.H. was not to be placed for adoption. Instead, the parents desired help with the care of their child for six to twelve months while they tried to regain financial stability. Consequently, on February 24, 1999, when A.M.H. was four weeks old, the parents went to juvenile court and explained that they could not afford to care for A.M.H. and wanted temporary foster care. Rather than contacting the Department of Children's Services, the juvenile court officer telephoned Mid-South, which agreed to provide three months of foster care for A.M.H. That same day, the parents entered into an "interim care agreement" with Mid-South that specifically stated that the agreement did not terminate parental rights. A.M.H. was placed in the foster care home of the appellees, Jerry L. Baker and Louise K. Baker, the couple now seeking the termination of parental rights and the adoption of A.M.H. The parents of A.M.H. and the Bakers orally agreed that the parents could visit A.M.H. once a week. The father of A.M.H. testified to the following:

> I was thinking that at that time, you know, we did not have health insurance for our child, and we had the darkest time – hardship. So I would think that for the benefit of the child, maybe it's a good idea to stay with the Bakers for three months because the Bakers told me – Mr. Baker told me very clearly that they are Christian families generation after generation. We are just like brothers and sisters, and that's God's will, for him to get to know me. So I was very moved to tears by Mr. Baker's remarks.

After placing A.M.H. with the Bakers, the parents visited her regularly in the Bakers' home, consistently bringing food and gifts and taking photographs at every visit. On one occasion, the parents were allowed to take A.M.H. out of the Bakers' home for the day. The father had obtained a part-time job with the University of Memphis, and, despite the absence of an order requiring the parents to provide child support to Mid-South or the Bakers, the parents attempted to give the Bakers $300 in cash for the care of A.M.H.; the Bakers would not accept the money. In April of 1999, the father was arrested on the attempted rape charge. Although the father was released the next day, he was fired from his part-time job with the university, which he had obtained after losing his graduate assistant position. After the father's firing, the parents were living on the approximate $400 a month that the mother earned as a waitress.

Because their financial condition was not improving, the parents decided to send A.M.H. to China to have relatives care for her temporarily. The father testified that in May of 1999, Mr. Baker told the father that it was a bad idea to send A.M.H. to China and that the Bakers would keep A.M.H. until the father graduated from the university. The Bakers testified that the father asked them to adopt A.M.H., but the mother opposed the adoption. In a meeting at the Bakers' home, the Bakers told the father that they were unwilling to keep A.M.H. as long-term foster parents but wanted to adopt her. According to the Bakers' testimony, because the parents of A.M.H. would not agree to an adoption, they entered into an oral agreement after the father of A.M.H. led them in prayer and the parties discussed the issue. Under the oral agreement, the Bakers would raise A.M.H. until she

was eighteen, and the parents of A.M.H. would retain their parental rights. The Mid-South counselor testified that, in a meeting with Mid-South's attorney and the Bakers on May 19, 1999, the father of A.M.H. stated that the mother and he wanted to continue the custody arrangement but maintain their parental rights. The Bakers then pursued a legal change of custody.

On June 2, 1999, the father of A.M.H., the Bakers, the Mid-South counselor, and Mid-South's attorney met to explain to the father the legal effect of granting the Bakers temporary custody. According to Mrs. Baker's testimony, the father was told by the attorney "that this could go for one year or it could go for 18 years." Mid-South's attorney testified that he informed the parents that by giving up custody, "unless everybody consents to give the custody back . . . anybody that gives up even temporary custody takes a risk that . . . the court may not give custody back." He further testified:

> And I'm sure I would have given some hypotheticals about what some of those reasons [for not returning custody to the parents] might be; you know, that if the couple that wanted custody back [engaged in] drug use or alcohol use or some kind of abuse or not having a place for the child to live or not – you know, those sort of things could prevent you from getting custody back.

On June 4, 1999, Mid-South's attorney went with the Bakers and the parents of A.M.H. to the Juvenile Court of Shelby County to obtain a consent order transferring custody of A.M.H. to the Bakers. A juvenile court officer drafted the "Petition for Custody" and a "Consent Order Awarding Custody." The consent order does not mention child support or visitation. A juvenile court interpreter, the juvenile court officer, and Mid-South's attorney spoke with the mother privately before she signed the order; the mother was told that the order would enable the Bakers to obtain health insurance for A.M.H. The juvenile court officer who drafted the consent order testified that the mother was very concerned that the arrangement be temporary and that the parents would continue to have "open visitation" with A.M.H. through the duration of the Bakers' custody.

Despite the mother's concerns that the arrangement be temporary, the juvenile court officer added a guardianship provision to the consent order so that the Bakers could obtain medical insurance for A.M.H. Mrs. Baker stated that there was no discussion of guardianship during the meeting between the Bakers and the parents of A.M.H. prior to the execution of the consent order in juvenile court.

The Bakers testified that as part of the custody agreement, the parents agreed that the Bakers would raise A.M.H. until she was eighteen years old and that the child would refer to the Bakers as "mommy" and "daddy." Contrary to the Bakers' testimony, the juvenile court officer testified that the parents were not agreeing that the Bakers could raise A.M.H. until she was eighteen years old. Indeed, the juvenile court officer testified that the mother "was fairly adamant that at some point she wanted her child back." The mother testified as follows: "I was told I can get my daughter back at any time. I asked him three or four times about that." Finally, the juvenile court interpreter, Pastor Kenny Yao, testified that the mother understood the agreement to be temporary and for the purpose of obtaining medical insurance for A.M.H. An order transferring custody and awarding guardianship was entered by consent; there was no court hearing on the matter.

-4-

After the consent order was signed on June 4, 1999, Mrs. Baker began keeping notes after each weekly visit by the parents. Her first entry was on June 5, 1999, when she wrote, "Gained custody on June 4th, 1999." She documented the date, the exact time of arrival, and the time of departure of the parents after every visit. She documented the gifts the parents brought (such as food, formula, diapers, and books) and the acts of the parents, noting if they were attentive to A.M.H. or engaged in what she considered misconduct (such as giving the baby "inappropriate" things like a small necklace). Although the notes written by Mrs. Baker characterize the father as "pushy" and the mother as emotional, the notes generally portray the parents striving in the face of fairly adverse conditions to maintain a relationship with their child, familiarize her with their Chinese culture, and ensure her health and safety.

On September 20, 1999, the University of Memphis suspended the father from taking further classes for the remainder of the academic year and required him to complete sexual abuse counseling. Because of the suspension, the father lost his status as a student and was subject to deportation. A university representative testified that after the suspension ended, the father returned to school in the fall of 2000 and completed his degree requirements; however, because he owed the university money, the father had not been awarded his degree at the time of trial.

On October 3, 1999, the parents asked the Bakers if they could take A.M.H. out for the day on the next Sunday. The Bakers refused, and the mother began crying. Mrs. Baker's notes for that visit include the following:

> We would like to get visits to every other week. We felt like they would wean away, but the last 2 visits we could see Casey [the mother] is wanting to come more. If Jack [the father] confronts us with the visit we are going to tell him this is the way its going to be and set rules for him. He is very pushy and overbearing.

The mother, through an interpreter at the trial, described her impressions during this time period as follows:

> At [the time of the custody hearing, the Bakers] pretend to be really nice. I didn't know it was a trap, but after I signed the documents, they tear their pretended face . . . . In the first three months when we went and visit our daughter, they were really nice to us. . . . When they tricked us to sign the temporary custody order, they immediately tear their pretend face, and they picked the most inconvenient time for us [to visit] and they tried to shrink the time [of the visits] as short as they can.

Mrs. Baker testified that she told the parents that A.M.H. could go out with the parents when she was old enough to make a decision on whether she wanted to go out with the parents or not. The juvenile court officer testified that during this time period, the parents contacted her several times complaining about their visitation arrangement and expressing their desire to regain custody of A.M.H.

In November of 1999, when A.M.H. was ten months old, the father of A.M.H. asked Mr. Baker to return A.M.H. to the parents' custody. Mr. Baker responded that he and Mrs. Baker did

not want to return A.M.H. and told the father not to mention his request to Mrs. Baker because she was pregnant. Mr. Baker also stated that he would hold the father responsible if Mrs. Baker had a miscarriage because she was worried about the custody situation. The father testified that he felt threatened and intimidated. The parents decided to wait for the Bakers' child to be born before pursuing the return of their daughter. The relationship between the parties continued to deteriorate; nevertheless, the parents continued to visit consistently and bring gifts. On February 21, 2000, the Bakers' child was born. Also, during this time period, the mother of A.M.H. became pregnant with her second child, and the father was contacted by immigration officials.

On May 3, 2000, the parents went to the Juvenile Court of Shelby County and signed a petition alleging a change in circumstances and seeking custody of A.M.H. Mr. Baker contacted the father and requested a meeting; they met but could not reach an agreement as to custody or visitation. The Bakers contacted Mid-South's attorney to represent them at the custody hearing and to pursue the termination of the parents' rights to A.M.H. The parents, who were still having financial difficulties, did not have an attorney at the hearing to regain custody. At the hearing on June 28, 2000, the Court Appointed Special Advocate submitted a report recommending that the Bakers retain custody and the parents be allowed supervised visitation twice a week for four hours each visit. The father told the referee that they planned to send their daughter to China to live with relatives. After briefly questioning the father, the referee denied the petition. Upon Mid-South's attorney's advice, the Bakers did not file a petition to terminate parental rights at this time.

The parents did not appeal the custody order. However, they continued to visit their daughter at the Bakers' home despite the increase in animosity between the parties. During that period, the father began working in Georgia and could not attend all of the visits with A.M.H. On August 1, 2000, after the mother refused Mrs. Baker's request that she leave one of these visits by a certain time, the police were called. After this incident, the father quit his job in Georgia because he feared their visitation with A.M.H. was in jeopardy. The parents asked the Bakers for a visit with A.M.H. at a restaurant rather than at the Bakers' home; the Bakers refused. However, after the mother of A.M.H. gave birth to her second child on October 28, 2000, the Bakers were very helpful to the parents of A.M.H., providing transportation and food and facilitating the parents' care of their baby boy.

Prior to January 28, 2001, A.M.H.'s second birthday, the parents requested to take their daughter for a family picture; they invited the Bakers to go with them and made an appointment at a photography studio. When the parents arrived with their son at the Bakers' home, they were told A.M.H. could not go because she was sick. The father testified to the following:

> Number one, that was our child – our first daughter's birthday – second birthday. That was a special day. Number two, according to Chinese culture, on birthday, family picture together is of much significance – whole family. . . . That was such a special day for us. We made appointment. If she was sick or if you had a doctor's appointment, why didn't you call me and tell me in advance, one day or two days, so that we made a rescheduled appointment. . . . They knew my phone number. So I was upset. I said, "Okay, today, we could not accept any more excuse." That's what I said to them. . . . Jerry Baker was so – he was, oh, so upset. He was not very

happy. . . . I said, "Today, we cannot accept any more excuses. We want the – we want to take our daughter to the studio for family to get a picture made, period." That's what I said, "Period," and he noticed that I was very pushy, very insistent, and he said, "you've got to leave here. You've got to leave here." I said, "I won't – not today, I won't leave here. Until we have picture made, I won't leave here." And then he said, "I'm going to call the police." I said, "Call the police. I won't leave here."

The police were called, and the officer told the parents not to return to the Bakers' house or they would be arrested. The Bakers' answers to interrogatories state that the parents were instructed by the police "not to return to the home of the Bakers." The police officer testified at trial that, even though it was late afternoon when he arrived at the Bakers' home, he would have told the parents not to return "that day." There were no further visits. On June 20, 2001, four months and five days later, the Bakers filed a petition to terminate parental rights to A.M.H. This four-month lapse in visitation is the ground upon which the chancery court found abandonment of A.M.H. and terminated the parents' rights to their daughter.

Although the parents no longer pursued a relationship with A.M.H. through visits in the Bakers' home, they soon contacted the juvenile court and asked for assistance in regaining custody of A.M.H. On February 15, 2001, eighteen days after their last visit with A.M.H., the parents sent a letter to the juvenile court and to the media setting forth the history of the case and stating that they wanted A.M.H. returned so that they could return to China. The father testified that they went to juvenile court twice between February and April. On April 9, 2001, the parents again went to juvenile court; the mother was sobbing. The parents told the juvenile court officer that they did not understand what they were doing when they signed the consent order. The court officer prepared a petition to regain custody for the parents. The Bakers were notified of the petition on May 4, 2001.[1] Mr. Baker telephoned the father, and they met. In the meeting, the father said that he wanted his daughter to be returned and that she could visit with the Bakers twice a week. Mr. Baker told the father that he would not agree to returning A.M.H. The father then offered to leave custody with the Bakers if he and the mother could bring A.M.H. home one day every other week. Ultimately, no agreement was reached.

In May of 2001, the parents of A.M.H. sent their seven-month-old son to China to live with relatives because they feared that if the father was convicted of attempted rape, their son would be taken from them. The parents, both of whom now worked in restaurants, sent the relatives money every few months for their son's care. (On December 1, 2003, the son returned from China to live with the parents.)

On June 6, 2001, the parents appeared in juvenile court for the hearing on their custody petition. Had the matter been heard that day as scheduled, the four-month period required for statutory abandonment would not have run. The hearing was rescheduled, however, to accommodate the Bakers' attorney; understandably, the parents were very sad and disappointed. The parents

---

[1] The petition to regain custody was not stamped as filed until May 29, 2001.

appeared for the rescheduled hearing on June 22, 2001. The father testified, "We went there on time – actually, we went there before eight o'clock, my wife and I. We were very eager. We went there. We were ready to have the hearing, and we thought we could have our child back that day." However, two days previously (which was four months and five days after the parents' last visit with A.M.H.), the Bakers had filed a petition for adoption and termination of parental rights in chancery court. Consequently, rather than hear the modification of the custody petition, the juvenile court transferred the custody case to chancery court; the father testified, "Of course, my heart was broken." The chancery court did not rule on this custody petition until its final order terminating parental rights.[2]

The filing of the petition for adoption and termination of parental rights by the Bakers began chancery court proceedings that would span thirty-two months and generate a technical record containing eleven volumes of motions, responses, and orders. The procedural history recounted in this opinion omits much of the actual litigation. The grounds alleged in the original petition seeking termination of the parents' rights were the parents' abandonment of A.M.H. by willfully failing to visit and the parents' abandonment of A.M.H. by willfully failing to support the child financially. The petition was later amended to assert grounds of termination based on the father's lack of legal status as a parent, the parents' mental incompetence, and the persistence of conditions preventing the child's reunification with the parents. The parents hired an attorney, and the Bakers continued to be represented by Mid-South's attorney until they hired a separate attorney in September of 2001. A guardian ad litem was appointed; she recommended that the parents not be allowed to visit with A.M.H. until the adoption proceedings were completed.[3] Around October of 2001, the guardian ad litem contacted Dr. David B. Goldstein, a clinical psychologist, and requested that he perform an evaluation of A.M.H. Dr. Goldstein testified that the guardian ad litem asked him to evaluate A.M.H. in order to address "the effects of removing a child from a well-bonded family situation and the effects of removing a child from their culture and placing them in a different culture." The court then appointed Dr. Goldstein to evaluate A.M.H. and the parties.

On January 7, 2002, the parents of A.M.H. married. The father took a DNA test that established that he was A.M.H.'s father. And during this time, the mother became pregnant with a third child. On February 7, 2002, upon the guardian ad litem's motion, the chancery court ordered the parents to surrender A.M.H.'s passport to the court and, upon the Bakers' motion, ordered the parents to pay $15,000 to the court for the guardian ad litem's fees, the DNA test, and the costs of the psychological evaluations. The father testified that it was impossible for the parents to pay the ordered $15,000 in fees, "especially after [the Bakers' attorney] subpoenaed us and all the local Chinese restaurants, and my wife lost her job as a waitress." The parents did not produce the passport. On February 8, 2002, the court entered an order (drafted by the Bakers' attorney) to show cause why the parents should not be found in contempt for refusing to surrender the passport. The order also appointed the Bakers as A.M.H.'s guardians as defined in section 36-1-102(24) and (25)

---

[2] A third petition for modification of the consent order awarding custody was filed by the parents on September 12, 2003; it was denied by the chancery court on May 12, 2004.

[3] Her recommendation was based on the fact that the parents had not seen A.M.H. for six months.

of the Tennessee Code Annotated and ordered that the parents have no contact with their daughter.

None of the witnesses could explain why the court ordered that the parents have no contact with their daughter.  It may have been intended as a means of forcing the parents to surrender A.M.H.'s passport; however, it is also possible that the court ordered no contact upon the advice of the guardian ad litem.  The guardian ad litem testified that she did not recommend visitation because "the status quo was that the child had not seen her biological parents in a number of months, I didn't believe that throwing the child into something different than the status quo was necessarily in her best interest."  The guardian ad litem continued to oppose visitation and reunification with the parents throughout the proceedings.  She believed that A.M.H. was attached to the Bakers and considered them to be her parents, although the guardian ad litem had never seen A.M.H. with her biological parents.  She further stated that she had read a book about Chinese girls being placed in orphanages and consequently was concerned that the parents wanted to return to China:

> From the very beginning of the case, it was very clear to me that [the parents'] intention was that if the child were returned to them, they wanted to go back to China.  They have never said anything different than that.  They have always said that when this case is over they would like to take her back. . . . I honestly can't tell the Court today I know to an absolute certainty what kind of life she would have there.  This book that I read caused me some concerns.

The parents ultimately paid the $15,000.  On February 20, 2002, the parents filed a motion for visitation.  On February 22, the court ordered the parents incarcerated for failing to surrender A.M.H.'s passport; the parents surrendered the passport.  Although there was a preliminary hearing on the matter in March 2002, the court did not rule on the motion for visitation, stating that it assumed there must have been a reason for the no contact order and that it was unable to decide the issue without more evidence.  At the hearing, the court expressed concern about the parents' interest in press coverage.  The father testified:

> You asked me why [we contacted the press].  Because at that time, I knew very clearly that I could not get justice from [the judge].  I could not get it, and I was in a desperate situation.  All I could turn to for help was the media.  I was trying to get the media's attention in order to help me to get my daughter back.

In July of 2002, Dr. Goldstein submitted a report that found that A.M.H., who by this time was three years old and had not seen her parents in over a year, considered the Bakers her psychological parents and concluded that a child who experiences loss in early childhood is at a greater risk of developing serious psychological disorders.  On September 9, 2002, the parents of A.M.H. had their third child, a daughter.

In February of 2003, the father of A.M.H. was acquitted by a jury of the charges stemming from the student's complaint of attempted rape.  Several motions were filed during this time period, and this Court specially designated a chancellor to preside over the case.  On September 23, 2003, the parents were allowed a visit with A.M.H., which was  monitored by Dr. Goldstein.  The video of this session, in which the parents see their child for the first time in two-and-a-half years, shows the love the parents have for their child; understandably, A.M.H. does not react to them as parental

figures. On September 29, 2003, the parents filed another motion for visitation. On November 7, 2003, the parents filed a renewed motion for visitation. On December 1, 2003, the parents saw their daughter with the Bakers' children at a Wal-Mart. The mother said to the children, "That's my daughter. Give me my daughter." The oldest Baker child grabbed A.M.H. and screamed for help; the police were called. On January 27, 2004, the designated chancellor ruled on the motions for visitation and ordered that the parents were to have no contact with A.M.H. until after the trial.

On February 23, 2004, almost three years after the parents filed their petition to regain custody in juvenile court, the trial on the petition to modify the custody order and the petition for adoption and termination of parental rights began. At the time of trial, because Mr. Baker had lost his prior job, the Bakers were $374,829 in debt, paid $1,795 per month for rent, were liable for loan payments on three cars, and had approximately $1,000 in their checking account. Mr. Baker testified that he currently was earning $110,000 per year. The father of A.M.H. was earning $2,300 per month as the manager of a restaurant; the mother of A.M.H. was staying at home with their youngest daughter; and their son was in day care so that he could learn English.

Several psychologists testified at the trial. None of these witnesses opined that harm would result from continued contact between A.M.H. and her parents or from expanded visitation. Dr. Goldstein, the court-appointed expert, testified that he did not conduct evaluations of the child or the parties (even though evaluations were ordered) and that he did not investigate the attachment between A.M.H. and her parents prior to writing his report. On September 23, 2003, he did monitor the videotaped session with the parents and A.M.H. Dr. Goldstein testified, "I did assume that there was very little attachment to the [parents] based upon the information that I had and based also on my knowledge of psychological development." Dr. Goldstein did not bring all of his notes to the trial. He testified that he was unable to say whether visitation should take place and unable to give any opinion as to custody. Dr. Goldstein limited his opinion to the best interest of the child, and even as to that topic, he would not render an opinion on whether having no further contact with her parents would be in A.M.H.'s best interest. The chancery court found Dr. Goldstein to be "highly qualified, highly respected . . . . Very knowledgeable, honest and a forthright witness."

At the trial, the parents of A.M.H. introduced evidence from three psychologists and a Chinese culture expert to refute the inference that the parents intended for the Bakers to raise A.M.H., to refute the opinion that A.M.H. had no attachment to her parents, and to show that the parents presented no abnormal psychological traits. The psychological experts offered by the parents pointed out what they perceived to be flaws in Dr. Goldstein's process and report. Dr. John Robert Hutson testified that he had reviewed Dr. Goldstein's deposition and report and that Dr. Goldstein did no evaluations of the parties. Dr. Hutson opined that there should be ongoing contact between the parents and A.M.H. Both Dr. Hutson and another psychologist, Dr. John Victor Ciocca, reviewed the video of the parents visiting with A.M.H. and found that the child responded favorably to the parents and the parents acted appropriately. The testimony offered by the parents was critical of the court's prevention of visitation with the child and of Dr. Goldstein's failure to perform certain evaluations. However, the court found this testimony to be "of little assistance to the court" because Drs. Hutson and Ciocca had never personally interviewed A.M.H.

-10-

The Chinese culture expert testified to the importance of "family" to the Chinese and the practice among Chinese students of allowing family members to care for their children temporarily. The chancery court found that the Chinese expert lacked credibility, despite similar testimony given by Pastor Kenny Yao, who the court found to be honest and without bias. Pastor Yao, who served as the mother's interpreter on several occasions (including in juvenile court when the petition to transfer temporary custody to the Bakers was drafted) testified as follows: "There is substantial difference between temporary custody and adoption in the Chinese culture. Adoption is you're giving the parental rights of the baby . . . to someone else . . . . But temporary custody is someone is helping to take care of the baby while you are unable to take care of the baby." He also testified that when the consent order was signed by the mother in juvenile court, he understood and translated the term "temporary custody" to the parents as follows: "[C]ustody means taking care. Temporary means not permanent."

Additionally, the parents introduced expert testimony from Dr. Yih-Jia Chang, who spoke fluent Mandarin Chinese. Dr. Chang performed a psychological evaluation (based on Chinese norms) on A.M.H.'s parents. She testified that they were both within the normal range. Dr. Chang testified that the father "may have a tendency to please others," "tends to go along with society," has a tendency to "seldom show dissatisfaction with authority," and appreciates various forms of artistic expression. She testified that the mother's impulse control was within the normal range and that she had a "high energy level." Dr. Chang's report also states that it is a common practice in China for a child to be placed temporarily in the care of extended family. Dr. Chang testified that she believed the evaluations were valid because the answers were consistent with her determinations while meeting with each parent. Dr. Chang testified that the evaluations were valid even though each parent was left alone in the room to fill out the evaluation questions while she met with the other parent and even though the answer sheets of both parents were left in the room. The chancery court ruled that "the underlying facts or data relied upon by Dr. Chang in forming her opinion" regarding the parents' mental health "indicate a lack of trustworthiness"; accordingly, the court excluded Dr. Chang's testimony.

Finally, the parents introduced several witnesses to counter the Bakers' portrayal of the father as manipulative and the mother as unreasonable and overly emotional. One of these witnesses, who had previously adopted two Chinese children through Mid-South and for whom the mother had worked as a babysitter, testified that the mother was very good with children and a nice person. On cross-examination, after establishing that this witness thought highly of Mid-South, financially supported Mid-South through donations, and knew that the Bakers would be a good placement for a child if they had been approved by Mid-South, the Bakers' attorney asked for the witness's opinion on what the outcome of the case should be. The witness stated:

> I believe that [the parents] should have [A.M.H.]. I know it will cause hurt and pain no matter what happens, and I feel for all concerned, but I do think that [the parents] deserve to have their child back. . . . [K]nowing [the parents] from their relationship with my children and myself, I just would find it in the child's best interest to go back to her birth parents.

After considering this evidence, the chancery court concluded that the parents are manipulative and dishonest people who appeared to have no intent to raise A.M.H. but have used the child from birth for financial gain and to avoid deportation. The chancery court found that the parents willfully abandoned A.M.H. by failing to visit or provide support for the four months immediately preceding the filing of the Bakers' petition to terminate parental rights. The court concluded that it would be in A.M.H.'s best interest to terminate parental rights and allow her to remain with the Bakers. The chancery court also concluded that the father was not the legal father of A.M.H. at the time that the petition to terminate parental rights was filed and terminated his parental rights under five of the six grounds under section 36-1-113 (g)(9)(A) of the Tennessee Code Annotated.[4] The chancery court rejected all of the other grounds for termination raised by the Bakers. Further, the chancery court ruled that the petition to modify custody filed in the juvenile court on May 29, 2001, "is not well taken and should be denied and dismissed." The petition for adoption was held in abeyance.

The Court of Appeals reversed the chancery court's ruling that the parents had abandoned A.M.H. in willfully failing to support her; it also reversed the chancery court's ruling that the father was not the legal parent of A.M.H. when the termination petition was filed. However, the Court of Appeals affirmed the termination based on the parents' willful failure to visit their daughter for four months and held that termination was in the best interest of A.M.H. Judge Holly M. Kirby

---

[4]Subsection 36-1-113(g)(9)(A) provides as follows:

The parental rights of any person who . . . is not the legal parent or guardian of a child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:

(I) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3).

Tenn. Code Ann. § 36-1-113 (2005).

dissented, stating that she would reverse the termination of the parents' rights to A.M.H. because the failure to visit was not willful. The Bakers do not appeal the lower courts' rulings on the unsuccessful grounds for termination. Consequently, the sole ground for termination presented in this Court is abandonment grounded on the parents' willful failure to visit A.M.H. for a period of four consecutive months immediately preceding the filing of the petition to terminate parental rights.

### *Analysis*

### *1. Jurisdiction*

The Bakers argue that this appeal should be dismissed under section 36-1-113(q) of the Tennessee Code Annotated, a statute of repose. The statute provides as follows:

> After the entry of the order terminating parental rights, no party to the proceeding, nor anyone claiming under such party, may later question the validity of the termination proceeding by reason of any defect or irregularity therein, jurisdictional or otherwise, but shall be fully bound thereby, except based upon a timely appeal of the termination order as may be allowed by law; and in no event, for any reason, shall a termination of parental rights be overturned by any court or collaterally attacked by any person or entity after one (1) year from the date of the entry of the final order of termination. This provision is intended as a statute of repose.

Tenn. Code Ann. § 36-1-113 (q) (2005). The Bakers argue that this Court does not have jurisdiction because the appeal of this matter has not been completed within one year of the entry of the chancery court's order terminating parental rights.

The primary rule in construing statutes is to ascertain and give effect to the intention or purpose of the legislature as expressed in the statute. State ex rel. Rector v. Wilkes, 436 S.W.2d 425, 427 (Tenn. 1968). Unless the statute is ambiguous, legislative intent is determined "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000); see also Sallee v. Barrett, 171 S.W.3d 822, 828 (Tenn. 2005); Austin v. Memphis Publ'g Co., 655 S.W.2d 146, 148-49 (Tenn. 1983). A statute is ambiguous if the natural and ordinary meaning of the language used may be interpreted to reach contrary results, "requir[ing] resort elsewhere to ascertain legislative intent." Austin, 655 S.W.2d at 148; LeTellier v. LeTellier, 40 S.W.3d 490, 498 (Tenn. 2001). Where the statutory language is not ambiguous, however, the plain and ordinary meaning of the statute must be given effect. Calaway ex rel. Calaway v. Schucker, 193 S.W.3d 509, 516 (Tenn. 2005).

Subsection 36-1-113(q) of the Tennessee Code Annotated is not ambiguous. The statute plainly states that the trial court's "order" terminating parental rights may not be challenged by a party to the proceeding "*except based upon a timely appeal* of the termination order as may be allowed by law." Tenn. Code Ann. § 36-1-113(q) (emphasis added). Here, the parents of A.M.H. timely appealed the order of termination; therefore, they are allowed to question the validity of the termination proceedings. Subsection 36-1-113(q) further states that a termination order may not be

overturned or collaterally attacked after one year from the date of the entry of "the final order." A judgment does not become final until "all direct appeals have been exhausted including an application for appeal or for certiorari to the Tennessee or United States supreme court." Cf. Tenn. Code Ann. § 39-17-901 (5) (2003). Because the one-year limitation under subsection 36-1-113(q) does not begin to run until the entry of a final order, we conclude the language used in the statute does not indicate an intent to affect a parent's ability to timely pursue a direct appeal.

Moreover, the legislature specifies that the "provision is intended as a statute of repose." Id. § 36-1-113(q). A statute of repose does not limit the time for appellate courts to hear and rule on a case that has been appealed timely;[5] a statute of repose limits the time within which an action may be filed. Calaway, 193 S.W.3d at 515; Penley v. Honda Motor Co., 31 S.W.3d 181, 184 (Tenn. 2000). Therefore, by designating subsection 36-1-113(q) "a statute of repose," the legislature demonstrated an intent that the statute serve as an absolute limit on the time in which a challenge to a final order of termination may be filed, not a limit on the time for a direct appeal.

## 2. Standard of Review

Parties seeking to terminate parental rights must prove two elements. First, they have the burden of proving that there exists a statutory ground for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2005); Jones v. Garrett, 92 S.W.3d 835, 838 (Tenn. 2002). Second, they must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2) (2005); In re F.R.R., III, 193 S.W.3d 528, 530 (Tenn. 2006). Both of these elements must be established by clear and convincing evidence. See Tenn. Code Ann. § 36-1-113(c)(1) (2005); In re Valentine, 79 S.W.3d 539, 546 (Tenn. 2002).

On appeal, the trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); In re F.R.R., 193 S.W.3d at 530. In weighing the preponderance of the evidence, great weight is afforded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. See Jones, 92 S.W.3d at 838. Questions of law, however, are reviewed de novo with no presumption of correctness. Langschmidt v. Langschmidt, 81 S.W.3d 741, 744-45 (Tenn. 2002).

## 3. Termination of Parental Rights

The sole ground for termination presented in this appeal is the parents' willful abandonment of A.M.H. by failing to visit her for four months preceding the filing of the termination petition. It is well established that both the United States and Tennessee Constitutions protect parents' rights

---

[5]Although the legislature has the power to enact statutes of limitation barring relief on complaints filed beyond the limitations period, see Maestas v. Sofamor Danek Group, Inc., 33 S.W.3d 805, 809 (Tenn. 2000), it does not have the authority to enact legislation affecting the courts' ability to process a timely filed cause of action. Because we find the statute does not limit judicial review of a timely appeal, we do not need to address whether limiting judicial review of a timely filed appeal would violate due process or "'constitute an impermissible encroachment upon the judicial branch of government.'" See Lynch v. City of Jellico, 205 S.W.3d 384, 393 (Tenn. 2006) (quotations omitted).

to the custody and care of their children. See Hawk v. Hawk, 855 S.W.2d 573, 578-79 (Tenn. 1993) ("[P]arental rights constitute a fundamental liberty interest."). Therefore, before a parent's rights to a child may be terminated by a court, "there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated." In re Swanson, 2 S.W.3d 180, 188 (Tenn. 1999). By statute, the legislature has designated "abandonment" as a valid ground for the termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2005). The applicable definition of "abandonment" is found in section 36-1-102(1) of the Tennessee Code Annotated, which provides as follows:

> (A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
>
> (I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;
>
> . . . .
>
> (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;
>
> . . . .
>
> (G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled.

Tenn. Code Ann. § 36-1-102(1)(A) (2001). A parent who has abandoned a child by "willfully" failing to visit is "unfit" under constitutional standards. In re Swanson, 2 S.W.3d at 188. Therefore, under those circumstances, termination of parental rights is appropriate. See, e.g., In re F.R.R., 193 S.W.3d at 530. Where the failure to visit is not willful, however, a failure to visit a child for four months does not constitute abandonment. We have held that a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child. See In re Swanson, 2 S.W.3d at 189.

-15-

Here, we are presented with a situation in which the parents of A.M.H. actively pursued legal proceedings to regain custody of A.M.H. during the "abandonment" period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights. As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed de novo with no presumption of correctness. Cf. In re Valentine, 79 S.W.3d at 548 (concluding that "[s]ubstantial noncompliance is a question of law which we review de novo with no presumption of correctness."). We hold that the evidence in this case does not support a finding that the parents intentionally abandoned A.M.H..

Disregarding the witnesses that the trial court found to lack credibility, the record clearly shows the following undisputed facts:

(1) On January 28, 2001, the parents visited A.M.H. in the home of the Bakers;

(2) The parents became upset when they could not take A.M.H. with them to sit for a family portrait;

(3) The parents refused to leave A.M.H. until a police officer arrived and told them to leave;

(4) During the subsequent four months and five days prior to the filing of the petition for termination, the parents pursued help in regaining the custody of their child by contacting the juvenile court and the local media;

(5) During this time, the parents initiated two juvenile court hearings on a petition to regain custody of A.M.H.;

(6) The first hearing was thwarted by the Bakers' request for a continuance; and

(7) The second hearing was thwarted by the Bakers' initiation of proceedings in chancery court.

This undisputed evidence does not support a finding that the parents' failure to visit A.M.H. was willful. Where, as here, the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a "willful failure to visit" as a ground for abandonment.[6] Therefore, we hold that there has been no willful abandonment and reverse the termination of

[6]Citing section 27-1-113 of the Tennessee Code Annotated, the Bakers argue that this Court must find abandonment because it is bound by the concurrent findings of fact of the trial court and the Court of Appeals. We conclude, however, that the statute is inapplicable to the dispositive question in this case–whether the parents' failure to visit constituted a willful abandonment–because that question is a question of law, not a question of fact.

Because we conclude that there are no grounds for terminating parental rights, it is unnecessary to reach the best interest of the child analysis. See In re D.L.B., 118 S.W.3d 360, 368 (Tenn. 2003); Tenn. Code Ann. § 36-1-113(c) (2005).

parental rights. Accordingly, the Petition for Adoption and Termination of Parental Rights is dismissed.[7]

### 4. Custody

When this Court reverses a lower court's termination of parental rights in a contest between parents and non-parents for custody, we usually remand the case to the trial court for the preparation and implementation of a plan to return custody of the child to the parent. In this case, however, we must first address the consent order entered by the juvenile court in June of 1999 that transferred the custody and guardianship of A.M.H. to the Bakers. Unless we conclude that the consent order is unenforceable, the parents of A.M.H. have no superior rights to the custody of A.M.H. The parents argue that the consent order is unenforceable and ask that they be granted custody.

In an initial proceeding, natural parents have superior rights in relation to non-parents who seeking custody under article I, section 8 of the Tennessee Constitution. Blair v. Badenhope, 77 S.W.3d 137, 141 (Tenn. 2002). But "absent extraordinary circumstances," parents are not entitled to superior rights when seeking to *modify* a valid order placing custody with a non-parent "even when that order resulted from the parent's voluntary relinquishment of custody to the non-parent." Id. at 143. Despite this rule, we have recognized four circumstances in which a natural parent continues to enjoy a presumption of superior rights to custody:

> (1) When no order exists that transfers custody from the natural parent;
>
> (2) When the order transferring custody from the natural parent is accomplished by fraud or without notice to the parent;
>
> (3) When the order transferring custody from the natural parent is invalid on its face; and
>
> (4) When the natural parent cedes only temporary and informal custody to the non-parents.

Id. Recognizing the possibility that in the informal setting of juvenile court unrepresented parents could enter into a formal order without understanding the actual effect of transferring custody, we have explained that it is only a parent's "voluntary transfer of custody to a non-parent, *with knowledge of the consequences of that transfer*," that will defeat a parent's claim to superior rights of custody. Id. at 147 (emphasis added).

---

[7]In addition to the question of whether the evidence supports termination under the statute, the parents of A.M.H. present several constitutional grounds for reversal. Because this case is fully resolved on statutory grounds, we decline to address these issues. See Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995) ("[U]nder Tennessee law, courts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties.").

The evidence establishes that the parents were misled as to the consequences of a change in custody and uninformed about the guardianship provision and, therefore, did not enter into the agreement with knowledge of the consequences of the transfer of custody and guardianship. Even if we only consider the testimony from witnesses that the chancery court found to be credible, the evidence shows that the parents were instructed that the transfer of custody was temporary and that barring inappropriate conduct by the parents, custody would be returned to the parents. Mrs. Baker testified that, the parents were informed that the custody arrangement "could go for one year or it could go for eighteen years." Mid-South's attorney testified that, he informed the father of A.M.H. that if the Bakers did not consent to return A.M.H. to the parents' custody, the court might not return custody in situations such as where "the couple that wanted custody back [engaged in] drug use or alcohol use or some kind of abuse or [did] not [have] a place for the child to live." The juvenile court officer who drafted the consent order testified that, the mother was told that the custody transfer would be temporary and that the parents would have "open visitation." The juvenile court officer also testified that the mother asked several times for verification that the transfer would be temporary before she would sign the consent order. The translator for the parties, Pastor Yao, testified that the mother understood the agreement to be temporary and for the purpose of obtaining medical insurance for A.M.H.

This evidence overwhelmingly shows that the parents' voluntary relinquishment of custody was entered as a temporary measure to provide health insurance for A.M.H. with the full intent that custody would be returned. Therefore, we hold that the parents of A.M.H. did not voluntarily transfer custody and guardianship of A.M.H. to the Bakers with knowledge of the consequences and, therefore, are entitled to superior rights to custody. As we stated in Blair:

> Where a natural parent voluntarily relinquishes custody without knowledge of the effect of that act, then it cannot be said that these rights [to the care and custody of one's child] were accorded the protection demanded by the Constitution. As such, application of the superior rights doctrine in a subsequent modification proceeding would be justified.

Blair, 77 S.W.3d at 148 n.3. Accordingly, we hereby revoke the parental consent to the change of custody and guardianship, and consider the competing claims of the parties, giving due deference to the parents' superior rights to the care and custody of A.M.H.

Under the superior rights doctrine, "a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child." In re Askew, 993 S.W.2d 1, 4 (Tenn. 1999). Therefore, the determination of a custodial dispute between a parent and a non-parent rests on a determination of whether there is substantial harm threatening a child's welfare if the child returns to the parents. Only then may a court find a sufficiently compelling justification for the infringement of the parents' fundamental right to raise a child as they see fit. See id. at 3.

Here, the only evidence of substantial harm arises from the delay caused by the protracted litigation and the failure of the court system to protect the parent-child relationship throughout the proceedings. Evidence that A.M.H. will be harmed from a change in custody because she has lived and bonded with the Bakers cannot constitute the substantial harm required to prevent the parents

from regaining custody.[8]  We have previously rejected the contention that when a child has been in the custody of a non-parent for a significant period of time, a lesser standard may be applied in determining whether parental rights may be terminated.  In re Swanson, 2 S.W.3d at 188 n.13.  "Such a standard would increase the likelihood for delaying cases in order that the child remain" in the custody of the non-parent.  Id.  The same reasoning applies in this situation.

Additionally, we note that the testimony concerning the general conditions in China is not relevant to a finding of substantial harm.  Financial advantage and affluent surroundings simply may not be a consideration in determining a custody dispute between a parent and a non-parent.  See Hawk, 855 S.W.2d at 582 ("[M]ere improvement in quality of life is not a compelling state interest and is insufficient to justify invasion of Constitutional rights.") (internal quotation marks and citation omitted).  The evidence at trial showed that the parents have overcome many obstacles to achieve financial stability and are ably taking care of their other two children.  Given the lack of evidence of a threat of substantial harm to A.M.H. if she is returned to her parents, we conclude that physical custody of A.M.H. must be returned to the parents.

*Conclusion*

Having found that the trial court erred in terminating Shao-Qiang ("Jack") He's and Qin ("Casey") Luo's parental rights, we dismiss the Petition for Adoption and Termination of Parental Rights and reinstate the parental rights of Shao-Qiang ("Jack") He and Qin ("Casey") Luo.  Further, we revoke the parental consent to the change in custody and guardianship, vacate the juvenile court and chancery court orders concerning visitation, and designate the current custody and guardianship orders as temporary in nature.

The judgment of the Court of Appeals is reversed.  As the reinstatement of parental rights resolves the issues presented by the Bakers in chancery court, we remand this case to the chancery court for the transfer of jurisdiction over the remaining issues to the Juvenile Court of Shelby County where the modification of custody hearing originated.  We direct the chancery court to complete this transfer within twelve days of the entry of this judgment.  Cf. Tenn. Code Ann. § 36-1-118(e)(4)(A) (2005).  The Juvenile Court of Shelby County is directed to consider, prepare, and implement a plan to resolve the pending custody matter with a view toward reunification of A.M.H. with her natural parents, Shao-Qiang ("Jack") He and Qin ("Casey") Luo, in a manner that minimizes trauma to the child.

The attorney ad litem and guardian ad litem are hereby ordered relieved of any further participation in proceedings concerning A.M.H.

The costs of this appeal are taxed to the appellees, Jerry L. Baker and Louise K. Baker, for which execution may issue if necessary.  The Clerk of this Court is directed to send a copy of this opinion and judgment to the Juvenile Court of Shelby County.

---

[8]However, we recognize that such evidence may be relevant to the manner of implementing the transition in custody from the Bakers to the parents and to the possible allowance of visitation with the Bakers.

_____
WILLIAM M. BARKER, CHIEF JUSTICE