IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2023

IN RE VIOLET R.

**Appeal from the Circuit Court for Hamilton County**
**No. 21A0227    Mike Dumitru, Judge**

_____

**No. E2023-00308-COA-R3-PT**

_____

A father appeals the termination of his parental rights to his child.  The trial court found clear and convincing evidence that the father abandoned his child by failure to visit.  The court also determined that termination was in the child's best interest.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II, and KENNY W. ARMSTRONG, JJ., joined.

Tessa Creighton, Chattanooga, Tennessee, for the appellant, Richard R.

Wencke West, Cleveland, Tennessee, for the appellees, Brad B. and Shanna B.

**OPINION**

**I.**

**A.**

Richard R. ("Father") and Shanna B. ("Mother") are the biological parents of Violet R., born in October 2015.  During the marriage, the couple lived in Texas.  But they separated when the child was about ten months old.  With Father's consent, Mother and the child moved to Tennessee.  Father remained in Texas.  He visited the child in Tennessee on her birthday and at Christmas.

Father and Mother divorced in November 2017.  As part of the divorce decree, the Hamilton County Circuit Court adopted the parents' agreed permanent parenting plan for

their minor child. The parents agreed that the child would reside permanently with Mother and that Father would maintain his current visitation schedule. To that end, the agreed plan named Mother primary residential parent and granted Father no residential parenting time. It required Father to "be present" for the child's birthday and Christmas "unless alternate arrangements have been made." Father could make alternate arrangements or schedule visits with two months' advance notice.

Father did not adhere to the visitation schedule in the agreed plan. He made one trip to Tennessee to visit his child in 2018. The following year, he only visited the child for a couple of hours on her birthday. This was the last time he saw the child in person.

Father's phone contact with the child also tapered off after the divorce. Over time, the calls became shorter and less frequent. Father spoke with the child for the last time in April 2020. And his efforts to schedule additional calls ceased in July 2020, when his communication with Mother abruptly stopped.

In August 2020, Mother married Brad B. ("Stepfather"). In June 2021, Mother and Stepfather filed a petition for termination of parental rights and adoption by a stepparent. They alleged two statutory grounds for termination of Father's parental rights but ultimately pursued only one: abandonment by failure to visit.

B.

Father and Mother agreed that Father maintained a consistent visitation schedule for a couple of years. He traveled to Tennessee to see his child twice a year. And the parents spoke almost daily about the child. Mother described their relationship as "tense, but cordial." In April 2018, Mother and a friend brought the child to Texas to visit with Father and his family. For a while, Father even had weekly FaceTime sessions with the child. But his consistency was short-lived. He skipped his Christmas visits in 2018 and 2019. And he ended his 2019 birthday visit early.

The 2019 visit took place at the home Mother shared with Stepfather. Father described the visit as "slightly awkward" even though he agreed that Mother and Stepfather made him feel welcome. The child did not seem happy to see him. Uncomfortable with the situation, he decided to leave after a few hours. Mother complained that Father spent most of the visit telling her about his recent break-up instead of interacting with the child.

According to Father, the child seemed to lose interest in their FaceTime sessions as she grew older. Mother agreed that the child would sometimes fail to acknowledge Father's presence, walk away, or even hang up the phone. Mother insisted that she encouraged the child to talk to Father. But Father did little to engage the child's interest during the calls. After the child turned four in 2019, the child indicated she no longer

2

wanted to participate. So Mother stopped initiating communication with Father. She waited to hear from him.

Mother acknowledged that Father continued to ask about the child's welfare and whether she was available to "video-chat" after the 2019 visit. But he did so "sporadically" and often "in moments that were not feasible," such as when Mother was working or the child was at daycare. If they "were available to video-chat" when he called, they "would video-chat." Mother never refused a request for contact with the child. Although she urged Father to propose a more consistent schedule for the calls, he never did. The last time she heard from him before the petition was filed was in July 2020.

According to Father, it was difficult to form a meaningful relationship with the child while living in different states. Even scheduling FaceTime sessions became a challenge after the 2019 visit. While Mother never refused his calls, she often told him it was not a good time. He "wasn't sure how forceful to be." He thought reaching out too often "might have been a little inappropriate." He thought it best to wait for Mother to tell him an appropriate time to call.

Father offered a variety of reasons for his failure to visit the child after 2019. During their last FaceTime session in April 2020, the child "yelled out that she didn't want to speak to [him]." And she stormed off. He took this as a sign to "kind of take a step back." So he decided to postpone the birthday visit that year. He also lost his job in August. Dependent on income from freelance projects and part-time jobs, he moved in with his family to reduce expenses. But he could no longer afford to travel to Tennessee.

The court terminated Father's parental rights to the child. It concluded that there was clear and convincing evidence that Father had willfully abandoned the child by failure to visit. It also determined that termination was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody their child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (2021).

Tennessee Code Annotated § 36-1-113 describes both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn.

3

Code Ann. § 36-1-113(c)(1). If they prove the existence of one or more statutory grounds, they then must prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interests by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546. This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

Father does not dispute the existence of a ground for termination of his parental rights. He only argues that the trial court erred in finding clear and convincing evidence that termination was in the child's best interest. Still, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

The trial court found by clear and convincing evidence that Father willfully abandoned the child by failing to visit within the statutory period. "Abandonment by the parent" is one of the statutory grounds for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). One definition of "abandonment" includes a parent's failure to visit the child during the four months immediately preceding the filing of a petition to terminate the parent's parental rights to the child. *Id.* § 36-1-102(1)(A)(i) (Supp. 2020).[1]

---

[1] We apply the definition of abandonment in effect when the petition to terminate parental rights was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

At trial, Father conceded that he did not visit the child during the statutory period. Instead, he argued that his failure to visit was not willful. As our Supreme Court has explained, "a parent who attempt[s] to visit and maintain relations with his child, but [i]s thwarted by the acts of others and circumstances beyond his control, [does] not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. The absence of willfulness is an affirmative defense. Tenn. Code Ann. § 36-1-102(1)(I). The parent who alleges this defense bears the burden of proof by a preponderance of the evidence. *Id*.

Like the trial court, we conclude that the evidence is clear and convincing that Father abandoned his child by failing to visit. The evidence does not preponderate against the trial court's finding that Father failed to establish that his conduct was not willful. Financial constraints are not a valid defense to this ground for termination if, as here, "no visits were made during the relevant four-month period." *See id.* § 36-1-102(1)(E). Father's attempts to blame Mother for his failure to visit are also unavailing. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (holding "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child"). He conceded that Mother never prevented him from visiting or contacting the child. Their scheduling difficulties are not a justifiable excuse for his failure to take any steps to visit with or speak to the child after July 2020. By the time Mother and Stepfather filed the termination petition, Father had not spoken to the child in over a year. He had not seen the child in person in nearly two years.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). The best interests analysis should consider "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499.

Tennessee Code Annotated § 36-1-113(i) lists twenty factors for courts to consider in determining whether termination of parental rights is in the child's best interests. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

5

The trial court determined that ten statutory factors were applicable in this case. We concur.

Factor (A) focuses on the effect a termination of parental rights will have on the child's need for stability and continuity of placement. Tenn. Code Ann. §36-1-113(i)(1)(A). The trial court found that Mother, Stepfather, and their extended families were providing the child with stability and continuity; she was thriving in their care. By contrast, Father's "occasional" and "sporadic" communication could interrupt the child's stability.

Factor (C) considers whether the parent has demonstrated continuity and stability in meeting the child's basic needs. *Id.* § 36-1-113(i)(1)(C). The court found that Father's record of visitation and communication with the child did not show any continuity or stability. Father complains that the court disregarded his consistency in 2018 and his persistent efforts to be involved in the child's life in 2019 and beyond. But, as the court found, any consistency Father might have shown in early years quickly diminished. Father admitted that his efforts after the 2019 birthday visit were irregular. And even those efforts ceased during the summer of 2020.

Factor (D) inquires whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create one. *Id.* § 36-1-113(i)(1)(D). The court found no evidence of a healthy parental bond between Father and the child. The child referred to Father by his first name. She showed little interest in speaking or spending time with him. In the court's eyes, there was no reasonable expectation that Father was willing or able to create a parental bond with the child. He chose to take "a step back" after the child's outburst during their last FaceTime session. A few months later, he stopped communicating with Mother.

Factor (E) asks whether the parent has maintained regular visitation or other contact with the child and used it to cultivate a positive relationship. *Id.* § 36-1-113(i)(1)(E). Father's visitation and communication with the child were both inconsistent. He failed to comply with the minimal visitation requirements of the parenting plan. Over time, his efforts to contact the child became increasingly sporadic. Eventually, he stopped trying altogether.

Factors (H) and (I) consider the child's healthy parental attachments in the absence of the parent and other emotionally significant relationships. *Id.* § 36-1-113(i)(1)(H)-(I). The trial court found that Stepfather had assumed the role of a father figure in the child's life. The child also had a strong attachment to Stepfather's children from his previous marriage.

6

Among other things, factor (M) looks at whether the parent has demonstrated a sense of urgency in seeking custody of the child. *Id.* § 36-1-113(i)(1)(M). Father agreed to the terms of a parenting plan that afforded him minimal time with the child. Yet he failed to meet even that low bar. He never sought to modify the parenting plan to make alternate visiting arrangements. And he never proposed any plan to improve his relationship with the child.

Factors (O), (P), and (S) focus on the parent's understanding of the child's needs for support. *See id.* § 36-1-113(i)(1)(O)-(P), (S). Factors (O) and (P) ask whether the parent has ever provided safe and stable care for a child and whether the parent has demonstrated an understanding of the child's basic and specific needs. *See id.* § 36-1-113(i)(1)(O)-(P). Factor (S) questions whether the parent has consistently provided more than token financial support for the child. *See id.* § 36-1-113(i)(1)(S). The court found that, on the rare occasion that Father had responsibility for the child, he provided safe and stable care. But he struggled to anticipate the child's needs and required prompting to address them. And he generally provided financial support in accordance with the parenting plan. *See id.* § 36-1-113(i)(1)(S).

On appeal, Father continues to blame Mother for his strained relationship with the child. He insists that Mother and Stepfather hurt his parental relationship when they did not stop the child from calling Stepfather "Daddy." But there is no evidence of parental alienation here. Mother and Stepfather never disparaged Father in front of the child. And Father admits that Mother never refused him access to the child.

We share the trial court's conclusion that the combined weight of the proven facts amounts to clear and convincing evidence that termination of Father's parental rights is in the child's best interest. The evidence does not preponderate against the court's best interest findings. By the time of trial, the child had not seen or heard from Father in almost three years, a lifetime for a seven-year-old. Father does not have a meaningful relationship with his child. She has developed strong bonds with Stepfather and her new siblings. Re-establishing a long-distance relationship with Father at this juncture would only disrupt the child's stability.

### III.

We affirm the termination of Father's parental rights. The record contains clear and convincing evidence to support one statutory ground for termination. We also conclude that termination of Father's parental rights is in the child's best interest.

        s/ W. Neal McBrayer
        W. NEAL MCBRAYER, JUDGE