IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 13, 2010 Session

# IN RE: MATTER OF KAITLYN M.W.[1]

## NATHAN A.W.
v.
## CRYSTAL D.S.P.[2]

**Appeal from the Juvenile Court of Tipton County**
**No. J 18964    William A. Peeler, Judge**

---

**No. W2010-00301-COA-R3-CV - Filed December 28, 2010**

---

This is a child custody case.  The mother and father were never married to each other; the child was born when both were teenagers.  Under the parenting plan, the mother was designated as the primary residential parent and the father had parenting time every weekend. After the father married, disputes ensued; many were disputes between the father's wife and the child's mother.  The father filed a petition to modify the parenting plan to designate him as the child's primary residential parent.  He alleged, among other things, that the child was often tardy or absent from school, that the mother lacked stability, and that mother prevented him from exercising his parenting time.  The trial court found no material change in circumstances and declined to change custody.  The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

HOLLY M. KIRBY, J.,, delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Thomas D. Forrester, Covington, Tennessee, for Petitioner/Appellant, Nathan A.W.

Frank Deslauriers, Covington, Tennessee, for Respondent/Appellee, Crystall D.S.P.

---

[1] The case was initially styled "In Re: Matter of Kaitlin M.W."  However, school records and other documents in the appellate record spell the child's name as Kaitlyn, so we use that spelling in this Opinion.

[2] The mother's name is spelled various ways in the appellate record and in the parties' briefs.  For purposes of this Opinion, we will utilize the spelling as it appears in the mother's signature.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Respondent/Appellee Crystall D. S. P. ("Mother") and Petitioner/Appellant Nathan A.W. ("Father") began their relationship when they were thirteen and fifteen years old, respectively. The child at issue, Kaitlyn M.W., was born on February 23, 2001, when the parties were seventeen and nineteen years old. Neither party completed high school, but Mother later obtained her G.E.D. They lived together for several years after Kaitlyn was born, but were never married to one another. Father obtained employment as a truck driver. Mother worked a variety of low-wage jobs. She lived primarily with her mother and stepfather, but at times lived other places.

In December 2005, after Father and Mother separated, they agreed on a permanent parenting plan. It was entered in the Tipton County Juvenile Court. Under the parenting plan, Mother was the primary residential parent and the child lived with Mother during the week. Father had residential parenting time every weekend. The parties agreed to split holidays and agreed that Father would receive two-week uninterrupted residential parenting periods with the child twice every summer. Major decisions were to be made jointly. The parenting plan provided that Father would pay Mother $40 in child support each week. The record indicates that the parties operated under this parenting plan reasonably harmoniously for a year or so.

Mother married in June 2006. She and her husband separated within two years of their marriage.

In February 2007, Father married Rhonda M.W. ("Stepmother"). Stepmother is employed as a respiratory therapist, and has custody of a son from a prior relationship; the son is several years younger than Kaitlyn. Father and Stepmother own a two-bedroom home in Covington, Tennessee.

Disputes between the parties quickly followed Father's marriage to Stepmother. Stepmother and, to a lesser extent, Father contacted the Tennessee Department of Children's Services ("DCS") several times to report concerns about Kaitlyn's disheveled appearance, her excessive absences from school, allegations that Mother was using marijuana, and concerns that Mother's stepfather may have been molesting Kaitlyn. DCS investigated the allegations but apparently took no action. Stepmother and Father also contacted the local police about Mother numerous times; apparently these disputes stemmed primarily from disagreements between the parties over either Father's residential parenting time or the place and time for exchanging Kaitlyn for visitation.

During the 2007-2008 school year, Kaitlyn missed eighteen days of school and was counted tardy twenty-six times. Consequently, in 2007, Mother met with the Tipton County Truancy Board. Subsequently, during the 2008-2009 school year Kaitlyn missed seven days of school and was counted tardy twelve times.[3] Mother appeared before the county Truancy Board a second time, and was fined for her noncompliance.[4]

In September 2008, Father filed a petition for modification of the parenting plan to designate him as Kaitlyn's primary residential parent. Father alleged that a material and substantial change in circumstances had occurred since the entry of the permanent parenting plan. He asserted, *inter alia,* that the child's educational needs were not being met by Mother, that under Mother's care, she was excessively absent or tardy to school, that Mother did not have a stable home, that Mother would not cooperate with school officials' request to have the child tested for attention deficit disorder, that Mother prevented Father from exercising his parenting time, that Mother allowed her boyfriend to spend the night at her home while the child was there, and that Mother "regularly use[d] illegal drugs." Father claimed that it would be in the child's best interest for the Court to designate him as the primary residential parent, with Mother as the alternative residential parent.

Mother denied the allegations in Father's petition for modification. She asserted that the child was appropriately cared for and doing well in school. Mother claimed that she and the child had lived in Tipton County with her mother and stepfather, except during the time period in which Mother was married. She maintained that changing the designation of primary residential parent would not be in Kaitlyn's best interest.

In November 2008, the parties entered into a consent order requiring both parties to be drug tested. Neither party tested positive.[5]

In March 2009, the juvenile court entered an order requiring that Mother, Father, Stepmother, and Kaitlyn undergo psychological evaluations "for purposes of determining the parental

---

[3]The record contains several different figures as to the number of absences and tardies Kaitlyn had in a given school year. For purposes of this Opinion, we will use the figures provided in testimony at trial by a Tipton County school official.

[4]Mother was fined $240. Mother paid $60 of the fine; payment of the remaining $180 was suspended contingent on compliance.

[5]The record contains only the results of Mother's drug test. However, it is undisputed that Father was routinely drug tested for his employment as a truck driver and had never failed a drug test.

fitness of the parties concerning the care, custody, and/or visitation of the parties' minor child."[6]  These psychological evaluations were performed in March 2009.

A bench trial was conducted on October 28, 2009.  The trial court heard testimony from Mother, Father, Stepmother, and other witnesses.  The psychologist's report to the trial court was made an exhibit and entered into evidence.

In his testimony, Father outlined the reasons why he sought to be designated as Kaitlyn's primary residential parent.  He noted Kaitlyn's frequent absences and tardiness at school, and claimed that her attendance improved only after Father filed his petition for custody.  Father also voiced concern that Kaitlyn had tested below grade level.  He said that her grades had improved only because the teacher gave her private lessons.  Father claimed that school officials wanted the child tested for ADHD, and that Mother refused to do so.

Father also testified that Mother interfered with his weekly parenting time, and his summer parenting time as well.  He said that Mother told him that she objected to him taking the child on family water recreation outings, ostensibly because the child was afraid of them, and that she unilaterally decided to keep Kaitlyn with her every other weekend instead of allowing Father's regular every-weekend parenting time.  Father stated that Kaitlyn enjoyed herself on the family water recreation outings, such as tubing, and he stressed that proper safety precautions were taken at all times, including the use of life jackets.  Father also testified that Mother prevented him from seeing Kaitlyn on Halloween of 2008, despite an agreement between the parties that they both would see the child during the holiday.  Father said that he was unable to talk to Mother without an argument, and he claimed that she was consistently uncooperative and argumentative.

Father expressed concern over Mother's lack of stable housing since entry of the parties' parenting plan.  While she was married, Father said, Mother stayed with her husband's mother.  Apart from that, she lived with her own mother, and often stayed overnight with a boyfriend.  Father also voiced concern regarding Mother's lack of regular employment, and the fact that she was receiving food stamps.

 Father stated that he and Stepmother had contacted DCS several times regarding his concerns about Kaitlyn, including his belief that Kaitlyn's stepfather may have molested her.  Father conceded that DCS investigated and took no action.  Father and Stepmother also contacted the police regarding Mother, at least ten times.  Most of the complaints concerned

---

[6]The order also required Father to maintain Kaitlyn on his medical insurance through his employer. Apparently a dispute arose concerning Mother's refusal to cooperate when she asserted that she could not afford the insurance co-pays.  This was resolved.

Mother's refusal to allow Father his scheduled parenting time, or allegations that Mother was harassing Stepmother. Father conceded that the great majority of the calls to the police and to DCS were made by Stepmother. He explained that Stepmother was the one who made the calls because she was the one being harassed.

Father maintained that the parenting plan should be modified to designate him as the primary residential parent. He conceded that, if the plan were modified, Kaitlyn would have to change schools, because he and Mother live in different school districts.

Stepmother also testified, and generally corroborated Father's testimony. She said that Father had experienced trouble from Mother in exercising his parenting time, on weekends and on holidays. Stepmother testified that Mother continuously exhibited an angry attitude towards her, which led Stepmother to file a criminal harassment complaint against Mother.[7] Stepmother acknowledged that she had contacted DCS multiple times for several reasons, including Kaitlyn's excessive absences from school, and her disheveled appearance. Stepmother intimated that Mother used marijuana.

Mother testified on her own behalf. Mother testified that, in addition to Kaitlyn, she had another child with her current husband, from whom she was separated. Her second child was three years old at the time of trial. Mother said that Kaitlyn had lived with Mother her entire life. At the time of trial, Mother and both children had been living with Mother's mother and stepfather for approximately eighteen months.

Mother conceded that, since 2006, her employment had been limited to a period of several months. At the time of trial, she was employed at a transmission business owned by her boyfriend, working from 10:00 a.m. to 2:00 p.m. each day. For her work, Mother said, she was paid $140 per week in cash. The hours enabled her to bring Kaitlyn to school and pick her up each day. Mother said she also received $400 per month in food stamps. Mother testified about her plans to begin college and study psychology.

Mother reported receiving a total of six visits from DCS. Mother was told these visits were to determine whether the house in which she and her children were living in was fit for a child, whether Mother's stepfather had abused or molested Kaitlyn, and whether Mother was taking illegal drugs. Mother said DCS never placed any restrictions on her following these visits.

Mother also addressed Kaitlyn's frequent absences from school in her testimony. She stated that she initially read the school's student handbook to mean that if a child became sick, then

---

[7]The disposition of the harassment complaint is unclear from the record.

the child should remain home until completely well, and that no visit to a physician was required for an absence to be excused.[8] Mother asserted that once the county Truancy Board explained the policy and requirements to her, Kaitlyn had no further attendance problems. She did not address why she went before the Truancy Board on two occasions in two separate academic years. At the time of trial, Kaitlyn had only missed four days of school and received one tardy during the current school year. All four absences were designated "excused." Mother noted that Kaitlyn had received mostly A's and B's, with only one C on her most recent report card.

Mother also addressed Father's assertion that he did not receive his agreed-upon parenting time. She said that, from August 2008 until the beginning of October 2008, she only allowed Father to exercise his parenting time every other weekend because Father was bringing Kaitlyn on weekend water recreation excursions. She asserted that Kaitlyn came home from a weekend trip crying about falling off while tubing, and that Mother believed that the child was scared. Mother claimed that this was her reason for unilaterally limiting Father's parenting time to every other weekend. Mother also claimed that, before the year preceding the trial, Father had not asked to exercise parenting time on Christmas morning or over Kaitlyn's summer vacation.

The clinical psychologist's report on the evaluations of Mother, Father, Stepmother, and Kaitlyn was made an exhibit at the trial. The psychologist determined that Father was suffering from depression, and was prone to anxiety. He said that Stepmother appeared to be more open and extroverted in nature, with a higher level of anger or hostility. Mother exhibited anxiety about the direction her life was taking, and frustration concerning her interactions with Stepmother regarding Kaitlyn. Kaitlyn did not complain to the psychologist about Stepmother, but did complain about her parents' smoking and inability to get along. The psychologist determined that the primary conflict was between Mother and Stepmother, with Father avoiding conflict wherever possible. That concluded the evidence presented at trial.

On November 5, 2009, the trial court issued an oral ruling. It found no evidence of drug use by any party. The trial court also observed, "Schooling has not been a big priority, the Court believes, to either parent." The trial court stated that it would adopt a "zero tolerance" policy concerning any subsequent unexcused school absence or tardies, and ordered that Kaitlyn

---

[8]Mother explained: "You get the Student Handbook when school starts telling you that your child should be fever-free and diarrhea-free for twenty-four hours before they come to school, not that they have to go to a doctor for those reasons, but they have to be free of those obstacles, and so I abided by that 100 percent. If she woke up that morning with a slight fever, she did not go."

receive the recommended testing for ADHD and for Mother to share the results of the testing with Father.

The trial court found no material change in circumstances warranting a change in custody. It found that the primary problem was the continuing conflict between the parties. The trial judge warned Mother not to interrupt or interfere with Father's scheduled parenting time. Father was instructed to deal directly with Mother, instead of leaving it to Stepmother to handle issues arising with Mother. Both parties were admonished not to fight or argue. The trial court made a minor modification to the parties' permanent parenting plan, to address concerns raised in the proceedings on Father's petition.[9] Father's request for an award of attorney fees was denied. Father now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

Father asserts that the trial court erred in determining that there was not a material and substantial change in circumstances warranting a change in Kaitlyn's custody. He claims on appeal that a change in the designation of primary residential parent is in Kaitlyn's best interest.

Addressing a petition to modify the custody of a child is a two-step process. "The threshold question is whether a material change in circumstances has occurred since the entry of the prior [custody] order." *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007). Only if the court finds a material change in circumstances does it proceed to consider whether changing custody is in the child's best interest. *Id.*

The determination of whether a material change in circumstances has occurred is a factual question. *In re: T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). The trial court's findings of fact are reviewed *de novo* on the record; those findings are presumed to be correct unless the preponderance of the evidence is otherwise. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); TENN. R. APP. P. 13(d). In weighing the preponderance of the evidence, the trial court's findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. *In Re: Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2002).

---

[9]The permanent parenting plan was modified so that Mother and Father would alternate, rather than split holidays. No issue is raised on appeal about this modification to the existing parenting plan.

ANALYSIS

Decisions involving the custody of a child are among the most important decisions faced by the Courts. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). When faced with a request to modify custody, courts generally favor the existing custody arrangement, on the premise that children tend to thrive in a stable environment. *Aaby v. Strange*, 924 S.W.2d 623, 627 (Tenn. 1996); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 2001). Thus, there is "a strong presumption in favor of continuity of placement" of a child. *Morris*, 2002 WL 31059222, at *2 (quoting *Bah*, 668 S.W.2d at 666; *see also* T.C.A. § 36-6-106(a)(3) (listing continuity as a factor in custody decisions). An existing custody order is considered *res judicata* on the facts as they existed at the time the order was entered. *Steen*, 61 S.W.3d at 327.

However, "Tennessee courts are statutorily authorized to modify custody arrangements as necessitated by intervening changes in circumstances." *Conner v. Conner*, No. W2007-01711-COA-R3-CV, 2008 WL 2219255, at *2 (Tenn. Ct. App. May 29, 2008). The statute governing requests for such a modification provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstances. A material change in circumstances may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B) (2005). Therefore, under the statute, the party seeking modification of the parenting plan to change the designation of the primary residential parent has the burden of proving a material change in circumstances. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick*, 90 S.W.3d at 570).

The Supreme Court has explained that "[t]here are no hard and fast rules" in determining whether such a material change in circumstances has occurred:

> While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered,"

and the change "is one that affects the child's well-being in a meaningful way." We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well being.

*Kendrick*, 90 S.W.3d at 570 (citation omitted). *See Boyer*, 238 S.W.3d at 255-257 (on evolution of the standard for finding a material change in circumstances). *See also Blakes v. Sims*, No. W2007-02129-COA-R3-CV, 2008 WL 5130425, at *4 (Tenn. Ct. App. Dec. 5, 2008) (on difference under amended statutes in material change in circumstances for modification of custody versus modification in parenting schedule). We note that "not all changes in the circumstances of the parties and the child warrant a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008).

On appeal, Father argues that the trial court erred in finding no material change in circumstances. He contends that several changes, considered together, amount to a material change in circumstances.

First, Father asserts that Mother neglected the child's schooling and educational needs because Kaitlyn missed or was tardy to school on a frequent basis during the past several years. Father notes that the child's absenteeism did not improve until after Mother appeared before the county Truancy Board on two occasions, and Father filed a petition to change custody. Father also claims that Mother neglected Kaitlyn's educational needs by refusing to have her tested for ADHD, as school officials had requested. Father asserts that Kaitlyn's grades are satisfactory only because she receives special, individualized instruction from her teachers. Father cites several cases for the proposition that "a child's poor attendance and a parent's failure to provide and address the child's education needs have been held on several occasions to be a material and substantial change in circumstances." *See Groce v. Groce*, No. M2008-015160-COA-R3-CV, 2009 WL 3295269 (Tenn. Ct. App. Sept. 16, 2009); *Bumpus v. Bumpus*, No. W2007-00395-COA-R3-CV, 2008 WL 763780 (Tenn. Ct. App. Nov. 8, 2007); *Killion v. Sweat*, No. E1999-0234-COA-R3-CV, 2000 WL 1424809 (Tenn. Ct. App. Sept. 21, 2000).

Second, Father alleges Mother does not have stability in her employment, her housing, or in her relationships with men. He asserts that this instability adversely affects Kaitlyn.

Third, Father claims that Mother has interfered with his parenting time. He contends that Mother unilaterally prevented Kaitlyn from seeing Father every other weekend during the summer months, ostensibly because Father took Kaitlyn on water recreation outings. Father also claims that Mother interfered with his parenting time during holidays, despite the

parties' agreement to share holidays. Father notes that T.C.A. § 36-6-101(a)(2)(B) provides that the failure of the primary residential parent to adhere to a parenting plan may constitute a material change in circumstances for purposes of changing custody.

Finally, Father argues that Mother exhibits such "hostility, cursing, and attitude" in her dealings with Father and Stepmother that Stepmother filed harassment reports with the police.

In the trial court below, the fact that the child had excessive absences and tardy days for two academic school years appears undisputed. It is unclear whether the trial court accepted Mother's explanation that the cause of the child's absenteeism was a misunderstanding over the interpretation of the school student handbook, an explanation that seems implausible given the period of time over which the absences occurred and the fact that Mother was summoned before the county Truancy Board on not one, but two occasions. Nevertheless, the trial court's ruling indicated that it accepted Mother's testimony that the situation had been remedied, necessitating only a stern warning against its re-occurrence. This finding by the trial court was based on its evaluation of the credibility of Mother's testimony. The trial court's evaluation of the witnesses' credibility is given great weight on appeal, and will not be overturned absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2002). From our review of the record, according appropriate deference to the trial court's findings on credibility, we find that the record supports the trial court's finding that the child's absenteeism problems, though serious, were largely resolved by the time of trial. On this basis, the cases cited by Father are distinguishable in that each involves a situation in which the child's attendance issues remained unremedied as of the time of trial. *See Groce*, 2009 WL 3295269, at *4; *Bumpus*, 2008 WL 763780, at *9-10; *Killion*, 2000 WL 1424809, at *1.

The trial court appeared to agree with Father's assertion at trial that Mother did not have stable employment and also had instability in her relationships with men. However, it seemed to conclude that this was a foreseeable result of the parties' joint choice to embark on a sexual relationship at a young age. The trial court observed that, although neither party had completed high school,[10] Father could more easily obtain a stable job that did not require an education. Thus, the trial court appeared to conclude that the issues surrounding Mother's unstable work history and her relationships with men either existed at the time the original parenting plan was entered or were foreseeable at that time. Thus, Mother's situation in this regard "was known or reasonably anticipated when the [parenting] order was entered," and would not be a material change in circumstances for the purpose of modifying custody. *Kendrick*, 90 S.W.3d at 570.

---

[10]The trial court recognized that Mother had obtained her G.E.D., but Father had not.

Finally, Father argues that Mother interfered with his parenting time and exhibited a hostile attitude in her dealings with both Father and Stepmother. Certainly, a parent's failure to adhere to the parenting plan is statutorily recognized as a basis for a finding of a material change in circumstances. Tenn. Code Ann. § 36-6-101(a)(2)(B). The trial court recognized that the arguing and tension between Mother and Father was detrimental to their daughter, and faulted Mother's temper in part for the disputes. The trial court also found that the problems were exacerbated by Stepmother's insertion of herself into the parties' parenting relationship. This is a recognized hazard; *see Schroedel v. Bumgarner*, 2010 WL 4024931, at *14 (Tenn. Ct. App. Oct. 13, 2010) ("Stepmother has attempted to improperly insinuate herself into matters regarding the child's custody and visitation. These actions are not in the best interest of the child.").[11]

Overall, while the trial court recognized that there were problems between the parties, it found that they did not amount to a material change in circumstances for purposes of changing the designation of the primary residential parent. Instead, the trial court addressed the issues by requiring the parties to attend counseling, admonishing Mother to refrain from actions that interfered with Father's parenting time, instructing Stepmother to "stay out of this," directing Father to communicate with Mother about Kaitlyn, and clarifying the parenting order on Father's residential parenting time and holidays. (Vol. 2 at 136-143.)

Overall, from our review of the record, and according appropriate deference to the trial court's evaluation of the witnesses' credibility, we must conclude that the evidence does not preponderate against the trial court's finding that these facts did not rise to the level of a material change in circumstances for custody purposes.

As noted above, the trial court may proceed to consider the child's best interests only if a material change in circumstances is established. *Boyer*, 238 S.W.3d at 259. Therefore, the above holding pretermits the other issues raised on appeal.

---

[11]We note also that this Court has recognized that a party repeatedly involving the police in child custody disputes is inappropriate and can indicate that the party contacting the police is at fault for exacerbating the disputes. *See Jackson v. Williams*, No. W2008-00148-COA-R3-CV, 2009 WL 2986106, at *4-5 (Tenn. Ct. App. Sept. 18, 2009).

**CONCLUSION**

The decision of the trial court is affirmed. Costs on appeal shall be taxed to the Appellant Nathan A.W. and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE