IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 4, 2013 Session

IN RE VICTORIA G. ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 75001      Timothy Irwin, Judge**

_____

**No. E2012-01522-COA-R3-PT-FILED-MAY 29, 2013**

_____

This is a termination of parental rights case involving two minor children, Victoria G. and Ethan G. ("the Children"). The Children were born during the marriage of David G. ("Father") and Rachel M. ("Mother"). When Father and Mother divorced in 2004, Mother was awarded primary custody of the Children. In 2005, Mother suffered a recurrence of cancer. She and the Children subsequently moved in with her sister, Amanda M., and her sister's husband, Paul M. When Mother died on October 6, 2005, Amanda M. obtained custody of the Children the following day. Father did not seek custody of the Children until April 2006. The parties engaged in protracted litigation, during which Father was allowed varying types of visitation. In September 2010, Father was granted progressively expanding visitation with the Children, designed toward increasing co-parenting in frequency and consistency over time. The visits did not go well, however, and the Children eventually refused to go with Father. The last attempted exchange, occurring on September 9, 2011, resulted in an incident wherein Father was arrested for assault. Father did not seek visitation with the Children after that date. Paul M. filed a petition seeking to terminate Father's parental rights on January 26, 2012, based upon the statutory ground of abandonment by willful failure to visit and support. Following a bench trial, the trial court granted the petition after finding clear and convincing evidence that Father had willfully failed to visit the Children for at least four months preceding the filing of the petition, and upon determining that termination was in the Children's best interest. Father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Joseph M. Viglione, Knoxville, Tennessee, for the appellant, David G.

Margaret Beebe Held, Knoxville, Tennessee, for the appellee, Paul M.

Michael J. Stanuszek, Knoxville, Tennessee, Guardian *ad Litem*.

## OPINION

### I. Factual and Procedural Background

When Father and Mother divorced, Father was awarded "standard" visitation.[1] Father apparently exercised visitation regularly until April 2005, when he and Mother agreed to modify the visitation schedule at Father's request. Father then began having "day" visits with the Children, by reason of what he described as an "abusive marriage" and his new wife's threats toward Mother and the Children. Meanwhile, as Mother's illness worsened, she and the Children moved in with Amanda M. and Paul M. so that they could assist in caring for Mother and the Children. Father left messages for Mother, regarding his co-parenting time, beginning in mid-August 2005 but was unable to contact her. When Mother died in October 2005, Amanda M. petitioned for and was granted custody of the Children based upon the court's finding of dependency and neglect. Father claimed he did not learn about Mother's death until two weeks after the funeral. He did not seek custody of the Children until April 2006 when he and his wife separated.

Father's petition was heard by the Juvenile Court Referee, who found, *inter alia*, that Father was aware that Mother's disease had recurred and that she had resumed cancer treatment in August 2005. As the Referee noted, Father did not inquire regarding Mother's condition, prognosis, or ability to care for the Children. Instead, Father was "totally absorbed in his own issues with his wife and he was unaware of the dire circumstances impacting the mother and the Children." The Referee further determined that due to Father's choice to remain in a marriage in which his wife consistently threatened the Children, Father "knew he was not a custodial resource for the Children following the mother's death and acquiesced in the maternal aunt and uncle obtaining custody of the Children by his non-participation in the Court proceeding."

The Referee elucidated additional findings, in pertinent part as follows:

The children have viewed the actions of their father as abandonment of them

---

[1] This term has traditionally been used to refer to visitation that occurs every other weekend. *See, e.g., Eldridge v. Eldridge*, 42 S.W.3d 82, 84 (Tenn. 2001).

and of their mother [. . . .] Both Courtney[2] [G.] and Victoria [G.] had stated in counseling with Jan Riepe that their mother informed them prior to her death that they could not trust their father and that she wanted them to live with their maternal aunt and uncle after she died. The children were very close to their mother, the children watched their mother slow[ly] decline and finally succumb to cancer, their father had chosen his abusive second wife over the children and severely restricted his visitation with the children, the father was not present for the children during their mother's illness or when their mother died, the father did not attend their mother's funeral, and the children felt abandoned by their father [. . . .] The father took no action to establish contact with the children or to assert his superior parental rights in gaining custody of the children through the Court until after the Final Order awarding custody to the maternal aunt and uncle had been entered on 3-7-06 and the father had finally decided to divorce his wife in April 2006 (six months after the mother's death and one year after the children began residing continuously with the maternal aunt and uncle).

The Referee concluded that Father had lost his superior parental rights upon entry of the final order granting custody to Amanda and Paul M. and that he would have to establish a material change of circumstance impacting the Children in order to gain custody. The Referee held that Father failed to prove such a change of circumstance, directing that Amanda and Paul M. would retain custody. Father was granted visitation with the Children.

Father appealed the Referee's ruling to the Juvenile Court, which confirmed the findings and recommendations of the Referee. In declining to conduct an evidentiary hearing, the Juvenile Court explained:

> The Court further finds that a full dress hearing was held before a lawyer/referee and that another full dress hearing before the Juvenile Court Judge would be a redundant step since an Appeal can be taken from the Decree to Circuit Court for another de novo hearing.
>
> Therefore pursuant to Rule 4 of the Rules of Juvenile Procedure and State v. York, 615 S.W.2d 154 [1981], the Court finds the interest of the parties and due process would best be served by proceeding directly to a de novo hearing before the Fourth Circuit Court of Knox County, Tennessee.

While the action was on appeal to Fourth Circuit Court, Father filed a motion to

---

[2] Courtney G. reached the age of majority during the pendency of this action.

dismiss, asserting that he had never been properly served with process in the dependency and neglect proceeding in Juvenile Court. The Fourth Circuit Court found the assertion to be accurate, with the court entering an order holding that the finding of dependency and neglect could not be upheld. As the Circuit Court explained, "all that flowed therefrom must be held for naught and is held for naught." The court also concluded that it was fundamentally unfair for Father to have to prove a change of circumstance in order to gain custody. The Juvenile Court's order was set aside, with the remaining issue designated as whether Amanda[3] and Paul M. should be granted custody "because the birth parent is unacceptable."

Paul M. filed a motion asking the Fourth Circuit Court to reconsider its ruling. He contended that Father had never before challenged the notice he received regarding the original petition. The court denied the motion to reconsider and stated in its memorandum opinion that the Juvenile Court had to "take it all the way back to the start, the commencement of this action for dependency and neglect." The Circuit Court further instructed the Juvenile Court to take such steps "as are appropriate." In the written order subsequently entered on July 16, 2010, the Fourth Circuit Court remanded the case to the Juvenile Court, directing the Juvenile Court to conduct a preliminary hearing pertaining to the allegations of dependency and neglect contained in the petition for emergency custody filed by Amanda and Paul M. on October 6, 2005, and to "conduct such further proceedings as the Juvenile Court deems necessary, and in accordance with the law."

A hearing was held in Juvenile Court on August 5, 2010. The court held it would be "extremely difficult, if not impossible, to hold a preliminary hearing on the Petition for custody filed by Amanda [M.] due to the five year time span from the filing of the Petition for Custody to the present . . . ." The court determined that the order of the Fourth Circuit Court gave it the authority to decide on the proper course of action upon remand. The Juvenile Court set the matter for a full hearing on all pending petitions and motions. Attendant to its ruling, the court concluded that Father had not lost his superior parental rights and that the hearing would be conducted incorporating the proper standard of proof with Paul M. having the burden of demonstrating a threat of substantial harm to the Children. The court also held that Father's visitation with the Children, which at the time consisted of four hours each Saturday at East Towne Mall, would continue pending further order of the court.

A full evidentiary hearing was held in Juvenile Court on September 8-10, 2010. The court made the following relevant findings:

---

[3] The court noted that Amanda M. had announced she and Paul M. were going through a divorce, and Amanda M. had opined Paul M. should be the custodian of the Children.

1.      That the Court finds that the determinative issue in this matter is whether the father's inaction before, during, and after the death of [Mother] rises to the level of dependency and neglect as those terms are defined by T.C.A. § 37-1-102(12);

2.      That the Court finds it difficult to believe that the father, who testified that he had exercised visitation with the children during the summer of 2005, did not know where the children and [Mother] were living in the months preceding [Mother's] death on October 6, 2005, and the Court further finds it difficult to believe that the father did not know the severity of [Mother's] cancer in the months preceding her death;

3.      That the Court finds that the testimony of the children regarding their negative feelings about their father and his family to be genuine; said testimony includes, but is not limited to, testimony that: a) they do not consider the father and his family as their family, b) they do not use their father's last name, [G.], even though it is part of their legal name, c) they do not enjoy their current visitation with their father, and if they had their choice, they would not see their father or his family, and d) their father chose his wife (now ex-wife), Kim [P.], over them and their mother in the months proceeding (sic) their mother's death;

4.      That the Court finds that Exhibit 1, which was a letter dated May 2, 2005 from the father to Neil Monaghan, his former attorney, bolsters the children's testimony that the father kept going back to Ms. [P.], a woman who had made threats to kill [Mother] and had burned the children's stuffed animals;

5.      That the Court finds that the father's testimony regarding his current visitation with the children, which depicts a family unit having a great time together, is directly at odds with the children's testimony regarding their current visitation with their father; specifically, the court notes that the two accounts of the visitations are so polarized that it is as if the father and the children are going to separate visitations;

6.      That the Court finds that the father has not done much to deserve the kind of hatred that the children have for him, but the father also has not done much to prevent that kind of hatred either;

7.      That the Court finds that the father's plight was exacerbated, at least in

part, by the actions of the mother's family in not communicating with the father at or near the time of the mother's death, and though testimony was presented that the mother's family had attempted to contact the father, the court is not convinced whether a substantial effort was made by the mother's family to find him;

8. That the Court finds that the testimony, and exhibits admitted, depicting the children's horseback riding trip with the father's family, and the wedding of the father's brother, leave no doubt that both of those events occurred in the summer of 2005;

9. That the Court finds that the children are dependent and neglected as those terms are defined by law because of the father's inaction and his unavailability for the children at the crucial time before their mother's death (April, 2005 through October, 2005), at the time [of] their mother's death (October 6, 2005), and after their mother's death (October, 200[5] through May 2006) . . . .

The Juvenile Court ordered that custody remain with Paul M. such that Father could "work toward standard visitation" with the Children over the following six to twelve months. The court also directed that visitation periods would gradually increase, with a schedule to be developed considering input from the Children's therapist, Dr. Peter Young. Father appealed this ruling to the Fourth Circuit Court.

During the hearing in Fourth Circuit Court on January 20, 2012, following what the court described as, "substantial colloquy with the parties and counsel," the court determined that significant changes had occurred since the hearing in Juvenile Court, which the Circuit Court elucidated as follows: (1) the oldest child, Courtney, had become an adult; (2) there had been "remarkable improvement in the Children's grades, mental health, behavior" since the cessation of visitation with Father; (3) Father had been found in contempt by the child support magistrate and incarcerated for the nonpayment of child support; (4) Father voluntarily had not exercised co-parenting for over four months; and (5) Father had been arrested for assault upon Paul M. in September 2011, which incident was alleged to have taken place in the presence of the Children. The Circuit Court remanded the case to Juvenile Court for appropriate action.

On January 26, 2012, Paul M. filed a petition in the Juvenile Court seeking to terminate Father's parental rights. The petition alleged as grounds that Father had willfully failed to visit and support the Children. The petition also claimed that termination was in the Children's best interest. The petition stated that Paul M. desired to adopt the Children and

that they wished to be adopted by him.

A trial on the merits was held in the Juvenile Court on the termination petition on June 22, 2012. Following the trial, the court entered a final order terminating Father's parental rights. In support of its holding, the court made the following findings, as relevant here:

> At the custody hearing on September 8-10, 2010, this Court affirmed Mr. [M.] as the proper custodial placement for the children, but awarded [Father] progressively expanding visitation rights, up to every other weekend, two weeks in the summer, and a week at Christmas. [Father] has failed to exercise his rights according to the visitation schedule, and admitted in open court that he had voluntarily relinquished his right to visitation for a period in excess of four (4) months prior to the filing of the Petition. . . .

> The children's therapist, Dr. Peter Young, testified that [Father] has failed to follow any of his recommendations for re-establishing or improving [Father's] relationship with his children, and that he has failed to make any adjustment to the behaviors that have led to the children remaining in Mr. [M.'s] custody.

> The children are thriving. They are healthy, doing well in school, and staying out of trouble. They are fully integrated into the [M.] home, and consider the [M.] family as their family. They express that they do not wish to have any further contact with [Father] or his extended family and that they do not consider him to be trust-worthy, or to be their father. It is in their best interest and in the best interest of the public for [the Children] to spend their teen-aged years in a safe, stable, loving home where they feel comfortable, and for the rights of [Father] to be terminated and the full care, custody, control and guardianship of the children to be vested in Paul [M.], with the right to seek adoption. . . .

> In summary, Mr. [M.] has proven, by clear and convincing evidence, that for a period of four (4) consecutive months immediately preceding the filing of the Petition to Terminate, [Father] has willfully failed to visit the children; thus, he has abandoned the children within the meaning of the statute.

> It is unequivocally in the best interest of the children to remain in the home of Paul [M.]:

>> A. [Father] has failed to maintain regular visitation or other contact with the children by failing to visit, call, send letters,

Christmas cards, gifts, attend children's events, or avail himself of any remedy in this Court.

B. [Father] has failed to develop a meaningful relationship with the children by such tasks as calling, attempting to resume visitation, noting birthdays, holidays and other significant events in the children's lives.

C.   The effect of a change of caretakers and physical environment would likely have a detrimental effect on the children's emotional, psychological and medical conditions in that the children are fully integrated into the [M.] home, where they have lived since 2005, where they wish to stay, and where they are doing well.

The trial court terminated Father's parental rights.  Father appeals that ruling.

## II.  Issues Presented

Father presents the following issues for our review, which we have restated as follows:

1.      Whether the Juvenile Court erred by failing to hold a preliminary hearing on the original Petition for Custody filed by Amanda M. when the case was remanded by the Fourth Circuit Court.

2.      Whether the Juvenile Court erred when it initially imposed an improper burden of proof on Father to succeed in his Petition for Custody by ruling that Father had lost his superior parental rights.

3.      Whether the Juvenile Court erred when it concluded that Father had abandoned the Children pursuant to Tennessee Code Annotated § 36-1-102.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a

presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Preliminary Hearing

Father contends that the Juvenile Court erred in failing to hold a preliminary hearing after the case was initially remanded by the Fourth Circuit Court. Father specifically argues

that the Juvenile Court ignored the directive of the Fourth Circuit Court, which it must not do pursuant to applicable law. *See Earls v. Earls*, M1999-00035-COA-R3-CV, 2001 WL 504905 at *3 (Tenn. Ct. App. May 14, 2001) ("[T]rial court does not have the authority to modify or revise the appellate court's opinion, or to expand the proceedings beyond the remand order.") We disagree. A review of the entire record demonstrates that the Juvenile Court did not ignore the Fourth Circuit Court's directive. The Juvenile Court held a full evidentiary hearing on all pending matters following the remand, including the issues of whether the Children were dependent and neglected and who should be the proper custodian.

In its ruling, the Fourth Circuit Court determined that the finding of dependency and neglect could not be upheld, stating that "all that flowed therefrom must be held for naught and is held for naught." With the Juvenile Court's order set aside, the Fourth Circuit Court directed the remaining issue to be whether Amanda and Paul M. should be granted custody "because the birth parent is unacceptable." The court further concluded that the Juvenile Court had to take the case "all the way back to the start," taking such steps "as are appropriate."

Upon remand, the Juvenile Court observed it would be almost impossible to conduct a preliminary hearing after the case had been pending for so long. The court determined the more appropriate course of action would be to conduct a full evidentiary hearing on all pending petitions and motions. The Juvenile Court proceeded with such a hearing, stating that the main issue to be determined was whether Father's inaction before, during, and after the death of Mother rose to the level of dependency and neglect. As such, the court clearly considered the "allegations of the petition for emergency custody filed by Amanda and Paul M. on October 6, 2005" as it was directed. The Juvenile Court satisfied the directive of the Fourth Circuit Court by considering the case from its inception before the finding of dependency and neglect was made. We conclude that the Juvenile Court did not err in its actions, as the Fourth Circuit Court specifically instructed the Juvenile Court to "conduct such further proceedings as the Juvenile Court deems necessary, and in accordance with the law." This issue is without merit.

## V. Burden of Proof Initially Imposed by Juvenile Court

Father also posits that the Juvenile Court erred in initially determining that Father had lost his superior parental rights in the original custody proceeding, thereby imposing the burden of proof on Father of establishing a material change of circumstances in order to regain custody. Father is correct in his assertion that "a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child." *In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999). As stated above, however, the Juvenile Court's initial ruling was ultimately vacated by the Fourth Circuit Court. Upon remand, the Juvenile Court specifically

concluded that Father had not lost his superior parental rights and conducted the hearing applying the proper burden of proof. As this error was corrected, and Father received a full evidentiary hearing with his superior parental rights intact, this issue is also without merit.

## VI. Abandonment - Failure to Visit

The trial court terminated Father's parental rights on the ground that he abandoned the Children by failing to visit them for four months preceding the filing of the instant petition. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2012) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2010) defines abandonment, in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d at 863.

Failure to support or visit is "willful" when the parent is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. Further, failure to visit or to support is not excused by another person's conduct "unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.*

This Court further explained:

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

This Court has often held that a parent's demeanor and credibility as a witness plays "an important role in determining intent, and trial courts are accordingly in the best position to make such determinations." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). Further, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made."

At trial, Father admitted he had not seen the Children in almost a year. Father testified that he attempted to see the Children on September 9, 2011, when he met Paul M. and the Children at the designated exchange point. The Children, however, would not leave with Father. While Paul M. and Father had a conversation during the scheduled exchange, Paul M. called the police. Father was later arrested for assault. Father did not admit to any wrongdoing during the exchange. He did, however, plead guilty to the assault charge so that, according to Father, he could receive judicial diversion and the Children would not have to testify. Father explained he had not attempted to see the Children since this incident because he did not want to cause them stress.

Father's testimony included several other material facts. Paul M. had encouraged Father's visits with the Children at first but then ceased to do so at some point. Father stated that he believed Paul M. had hindered his relationship with the Children but admitted Paul M. had not done anything to overtly obstruct the co-parenting time. Father also admitted that he experienced problems with the Children during visits and that some co-parenting

-12-

sessions went well while others did not. According to Father, he had to contact Paul M. a few times during visits to ask his advice on how to handle the Children or to have Paul M. speak with them. Father conceded that on one occasion, he requested that Paul M. come get the Children in the middle of the night because they were behaving so badly.

Father does not dispute that the Children were found to be dependent and neglected in September 2010 due to his actions. When asked if he had made adjustments to his behavior since then, he replied he had not because there was "no need." Father did not challenge the fact that he had not tried to re-establish a relationship with the Children since June 2011, stating it was "impossible." Admittedly, the Children had never expressed a desire to live with him. Father stated he had not been to any of the Children's school functions, ball games, or therapy appointments since the last visit. Father indicated he had not been informed of any of these events. Father also admitted he did not know what grades the Children had earned in school, even though he had the ability to access that information.

Dr. Peter Young, the Children's therapist, testified that he began working with the Children in 2007 and had also met with Father and Paul M. Dr. Young testified at length with reference to his therapy sessions. According to Dr. Young, he worked with the Children in an attempt to resolve the conflict among them and Father so that the visits could increase in frequency and quality. Paul M. was always cooperative and followed the therapist's suggestions. Father cooperated "to an extent" but had difficulty empathizing with the Children. Dr. Young indicated that the Children provoked Father because he was not there for them when Mother died. Dr. Young's further testimony established that the Children had built up a "reservoir of irritation and anger" toward Father due to his lack of contact close in time to Mother's death.

Dr. Young made numerous suggestions to Father for repairing his relationship with the Children, recommending that he spend time with them in their "spheres of living." Dr. Young also suggested that Father attend school events, church, ball games, and perhaps even dinner with the Children at Paul M.'s house. Paul M. was agreeable to this, but Father never followed the therapist's suggestions. Dr. Young indicated that when the Children spent time with Father, they did not think he heard or understood them. Conversely, Paul M. had been consistently empathetic and understanding with the Children. The Doctor opined that he did not believe their relationship with Father could be repaired. Dr. Young characterized Father as having persistently "strange" opinions and indicated it was best the Children not be forced to go with him. According to Dr. Young, it would be in the Children's best interest to sever their ties with Father, with the Children remaining with Paul M.

Victoria, age fourteen, testified that Father was never available for the Children. She stated she considered Paul M. to be her father instead because he did the things that fathers

were supposed to do. Victoria stated Father never came to events at her school or church. She explained that she never liked going to visit Father but that Paul M. would encourage them to go. The Children were supposed to meet and go with Father on September 9, 2011. She testified that when they refused to go with Father and attempted to return to Paul M.'s car, Father kicked the car door because he was angry. According to Victoria, she had had no contact from Father since the incident. Inasmuch, she had received no cards or gifts from him for her birthday or Christmas. As Victoria explained, she wanted nothing to do with Father because he was not present even before Mother died. Ethan, age eleven, provided similar testimony.

During the trial, Paul M. testified that the Children had resided with him since April 2005. Amanda M. and Mother had maintained a very close relationship as sisters. Paul M. stated that when Mother's condition declined, Mother and the Children moved in so that Amanda and he could provide appropriate care.

Paul M. confirmed that the visits between Father and the Children had not gone well. The Children did not desire to go, instead exhibiting tremendous dread and animosity. Although Paul M. tried to be positive regarding upcoming visits, telling the Children that such would be fun, their attitudes did not improve. He explained that as the visits continued, the environment worsened. Paul M. testified Father had always been welcome to join them at church, or even at home for dinner, but he had not done so.

According to the testimony of Paul M., the Children would call him from Father's home, indicating that they were running away and saying, "We can't stand it here." On one or two occasions, the Children would simply leave and start walking such that Paul M. would have to retrieve them. The final visit by Father occurred in June or July 2011. Upon their return, Victoria exited Father's car screaming, "I will never see you again!" Paul M. explained that he did nothing to interfere with co-parenting but that his encouragement of them to visit waned because of personal frustration. As Paul M. explained, the Children were so pained following Father's last visit, he believed they should not have to endure continued co-parenting time.

The evidence supports a finding that since the September 9, 2011 incident, Paul M. transported the Children to McDonald's every other Friday at the appointed time, but Father never arrived. As Paul M. noted, the Children were doing very well by the time of trial and had not needed to counsel with Dr. Young since January. Paul M. related that since the visits with Father had ceased, the Children presented much less anxiety and stress, performed better in school, and were more social.

Father admits, and the proof is undisputed, that he did not visit with the Children or

-14-

seek to visit with them for more than four months prior to the filing of the termination petition. Father argues, however, that his lack of visitation should be excused because of obvious enmity between Paul M. and himself. Father contends that he redirected his effort at maintaining a parent-child relationship to the courts. In support of this proposition, Father points to his filing of a "Brief in Support of Writ for Habeas Corpus" on July 27, 2011, and his pro se filing of "Proposed Stipulations of Fact" on January 27, 2012. Both of these documents were filed in the Fourth Circuit Court during the pendency of his appeal of the Juvenile Court's Order finding the Children to be dependent and neglected in September 2010.

Father relies on the case of *In re Adoption of A.M.H.*, 215 S.W.3d at 810, wherein our Supreme Court stated, "[w]here, as here, the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment." In *A.M.H.*, the biological parents visited their child regularly at the home of the foster parents, but the foster parents became resistant to the visits, finding the biological father to be "pushy." *Id.* The final visit resulted in a call to the police, with the police officer telling the biological parents not to return to the foster parents' home. *Id.* A dispute existed regarding whether the police officer directed that the parents not return at all or simply that they not return that day. *Id.* Regardless, the biological parents did not return to the foster parents' home but actively pursued legal proceedings in the juvenile court to regain custody during the four months preceding the filing of the termination petition. *Id.* The Court found that there was no willful failure to visit given those circumstances. *Id.* We do not find the *A.M.H.* case to be controlling here.

As this Court has previously explained, there is a difference between a parent who is discouraged or prevented from visiting and must seek court intervention, and a parent who, as here, did not have his visitation attempts thwarted in any way. In the case of *In re Keri C.*, 384 S.W.3d 731 (Tenn. Ct. App. 2010), the mother claimed that she could not be found to have willfully failed to visit her child because she was participating in a drug rehabilitation program during the relevant time period and was trying to fulfill the requirements of her safety plan so that she could petition the court for custody. The mother argued that she was actively pursuing custody and that her lack of visitation was not willful because she clearly did not intend to abandon the child, similar to the parents in *A.M.H. Keri C.*, 384 S.W.3d at 752. This Court rejected the mother's argument, however, stating that *A.M.H.* was distinguishable. *Id.* In that case, the custodians had discouraged the parents' visits and were "to some extent, responsible for the parents' failure to visit." *Id.* The facts in *Keri* established that the mother was welcome in the custodians' home and that she was invited to birthday parties, meals, and to attend church with the family, but she simply chose not to participate. *Id.* The Court found that the mother's failure to visit in that situation was

willful. *Id.*

Similarly, in the case at bar, the testimony established that Father was welcome in Paul M.'s home and free to attend church with Paul M. and the Children. There was no evidence that Paul M. had done anything to hinder Father's co-parenting with the Children. In fact, he had encouraged and even coerced the Children to visit Father against their will. Although there was evidence Paul M. became frustrated and somewhat less encouraging of co-parenting over time, there was a dearth of evidence that Father had attempted to see the Children and been obstructed by the custodian. There was also no proof Paul M. had influenced the Children in their negative feelings toward Father or regarding their reluctance and ultimate refusal to visit. Rather, the Children and their therapist indicated that the Children's feelings were based on the fact that Father had not been there for them surrounding the time of Mother's death. The Children also embraced a perception of Father's inability to empathize with or understand their feelings. We conclude that because Father cannot establish that his visitation attempts were thwarted by Paul M., he cannot rely on his own conduct or the Children's feelings toward him as an excuse for his failure to visit.

Further, the only evidence of enmity between the parties in this case stems from Father's dislike of Paul M. Father filed pleadings that contained denigrating remarks about Paul M. throughout the litigation. The incident on September 9, 2011, was described by the Children as an occasion wherein Father became angry, kicking Paul M.'s car door. As referenced earlier, Father pled guilty to the resulting assault charge.

Father admitted at trial that Paul M. did not obstruct Father's visitation with the Children. Father instead asserted he did not attempt to visit further so as not to upset them. A parent's desire to not "disrupt" the lives of the custodian or the children by visiting, however, is also not sufficient to excuse a lack of visitation. See *In re F.R.R., III*, 193 S.W.3d at 530. Since there was no proof Father was prevented from visiting the Children, the trial court did not err in finding that Father's admitted failure to visit for at least the relevant four-month period was willful.

Father's filing of a document purportedly seeking custody of the Children in the months prior to the termination petition being filed likewise does not negate a finding of Father's willful failure to visit. *See, e.g., In re Adoption of Angela E.*, ___ S.W.3d ___, W2011-01588-SC-R11-PT, 2013 WL 960626 at *5-6 (Tenn. Mar. 13, 2013). In *Angela E.*, our Supreme Court found that the father had done nothing to have his visitation reinstated, despite the filing of a petition, because he "took no further action to pursue the matter" and made no attempt to see the Children for almost three years. *Id.* The father argued that by filing a petition, he had demonstrated that he did not intend to abandon the Children. *Id.* The Court disagreed, finding that there was clear and convincing evidence establishing the

ground of abandonment by willful failure to visit. *Id.*

In this case, the record does show that Father filed a "Brief in Support of Writ of Habeas Corpus" on July 27, 2011, seeking a return of custody. There is nothing in the record, however, to demonstrate this was ever pursued at the trial court level. Father also filed a *pro se* pleading entitled "Proposed Stipulations of Fact" in January 2012, purportedly in preparation for a hearing in Fourth Circuit Court regarding his appeal of the Juvenile Court's dependency and neglect finding. These are the only efforts that Father made toward maintaining his parent-child relationship during the relevant time period. Even if Father had established that there was such enmity between the parties that he was prevented from visiting, these token attempts would be insufficient to negate his complete failure to visit the Children. As the trial court noted in its ruling, Father's mistake was not in leaving when the Children refused to go with him, it was in "not ever coming back or not requesting a different form of visitation" as Father presented no excuse for not "trying." Father could have called or sent cards or gifts, but he did nothing to maintain a relationship with the Children. The evidence does not preponderate against the trial court's ruling, by clear and convincing evidence, that Father willfully failed to visit the Children. This ground for termination must be affirmed.

## VII. Best Interest of Children

While Father has not appealed the trial court's finding that it is in the Children's best interest to terminate his parental rights, we have considered this issue because of its importance. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010). When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the Children's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877.

After reviewing the record, we hold that there is clear and convincing evidence that termination was in the Children's best interest. Therefore, we affirm the trial court's termination of Father's parental rights.

## VIII. Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to appellant, David G. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of

costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE