IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 12, 2015 Session

## IN RE BRAYDON C.

**Appeal from the Chancery Court for Madison County**
**No. 69044      James F. Butler, Chancellor**

_____

**No. W2014-01641-COA-R3-PT – Filed May 29, 2015**
_____

Petitioners Father and Stepmother filed a petition to terminate Mother's parental rights on the ground of abandonment for failure to visit and failure to support. The trial court denied the petition upon determining that Petitioners failed to demonstrate willful abandonment by clear and convincing evidence. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

David W. Camp, Jackson, Tennessee, for the appellants, Alesha C. and Justen C.

Anna B. Cash, Jackson, Tennessee, for the appellee, Serena W.

## MEMORANDUM OPINION[1]

This appeal arises from a petition to terminate parental rights and for adoption. The background facts relevant to our disposition on appeal are not disputed. Serena W. ("Mother") and Justen C. ("Father") are the unmarried parents of Braydon C.

---

[1]Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify he actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

("Braydon"),[2] who was born in November 2007, in Jackson, Tennessee. In May 2012, Father and Alesha C., his wife, ("Stepmother"), filed a petition in the Chancery Court for Madison County seeking to terminate Mother's parental rights and for adoption of Braydon by Stepmother.[3] In their petition, Father and Stepmother asserted abandonment for the willful failure to visit or support as the grounds for termination of Mother's parental rights. Following a hearing on June 23, 2014, the trial court dismissed the petition upon determining that Father and Stepmother had failed to carry their burden, by clear and convincing evidence, that Mother's failure to visit or support Braydon was willful. The trial court also found that Father and Stepmother had failed to carry their burden that termination of Mother's parental rights was in Braydon's best interests. The trial court entered final judgment in the matter on August 6, 2014, and Father and Stepmother filed a timely notice of appeal to this Court.

## Issue Presented

In their brief, Father and Stepmother (collectively, "Appellants") present the following issue for our review, as stated by them:

> Did the trial court err when it found that the burden of proving by clear and convincing evidence as to abandonment and best interest of the child had not been met by the Father and Stepmother and denied the petition for adoption and termination of parental rights?

## Standard of Review

Tennessee Code Annotated § 36-1-113 governs the termination of parental rights. It provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c) (2012). Accordingly, under the statute, a party who has standing to seek termination of a biological parent's parental rights must prove by clear

---

[2] It is the policy of the Court to use initials to protect the privacy of minor children.

[3] Father and Stepmother married in 2010.

and convincing evidence 1) the existence of a statutory ground for termination and 2) that termination is in the child's best interests. *In Re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Clear and convincing evidence is evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts . . . and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citations omitted). Because termination of parental rights proceedings under Tennessee Code Annotated § 36-1-113 are tried by a court sitting without a jury, we review the trial court's findings of facts *de novo* upon the record with a presumption of correctness unless the evidence preponderates otherwise. *Id.* We must then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *Id.* at 596-597. We review the trial court's conclusions on questions of law *de novo* with no presumption of correctness. *Id.*

## Discussion

Upon review of the record, we observe that Mother and Father entered into a parenting plan giving them equal parenting time in 2008. From 2009 to 2011, they engaged in litigation over custody and visitation in the Juvenile Court of Madison County. At a hearing on January 18, 2011, the juvenile court continued the matter after finding that Mother had been incarcerated shortly before the hearing for charges stemming from simple possession of illegal substances and was due to be released that day. By order entered February 11, 2011, the trial court ordered Mother to submit to a hair follicle test upon release from custody and ordered that "should [M]other fail to submit to a hair follicle test it will be presumed as positive and [M]other will have supervised visits with CASA as the supervising agency." The juvenile court further ordered that, if the test results were negative, the parties would return to the court's prior order of alternating visitation until the matter could be heard. The court found that Braydon had been living with Mother when she was arrested and that Braydon was living with Father on the day of the January hearing. The trial court designated Father temporary residential parent pending further proceedings. The January 2011 hearing was the last proceeding before the juvenile court.

It is not disputed that subsequent to the January hearing Mother entered a downward spiral, did not take a hair follicle test upon release from custody, and did not pass a hair follicle test until June 2013. It also is undisputed that CASA set up visitation sessions for a period of three months; that Mother was unemployed, without transportation, and unable to attend several of the sessions; that Mother was late to the final visitation session after having walked approximately ten miles to get there; and that CASA cancelled the visitation sessions thereafter. Braydon remained in Father's custody and, from November 2011 through December 2011, Mother sent five letters addressed variously to Father and Braydon at Father's last known address, which was Father's

grandmother's home.  In the meantime, Father had moved with Braydon to Mississippi without informing Mother.  Mother attempted to communicate with Father and his grandmother and to maintain contact with Braydon, but did not know Father's whereabouts and grandmother refused to provide any information.

In its well-drafted and thorough June 2014 memorandum to counsel and August 2014 order, the trial court set forth a comprehensive history of the matter.[4]  It found:

> Mother and Father worked at the same employer, King Tire Company.  Father was single and Mother was married.  Mother and Father had sex and she became pregnant.  Ultimately, she divorced over this.  As a result of her pregnancy, Mother lost her job and Father retained his job.  Mother has another daughter three years older than Braydon.  At Braydon's birth, Father lived with his grandmother ["Grandmother"].[5]  Father had no transportation at that time and Mother and her mother helped with his transportation needs.  Braydon stayed with Father and Grandmother for about 1 ½ months while Mother found a place to live in Milan, Tennessee and then Braydon returned to her.  Mother dealt mainly with Grandmother and had little communication with Father after the birth.  At some point in time, Father moved out from Grandmother's home.  Grandmother and Mother began to alternate weeks keeping Braydon.  For awhile, the Mother had no transportation.  Braydon stayed with Grandmother full time during many of these periods.  Mother remarried to [her husband] in approximately 2009, and they ultimately moved to Florida trying to find work.  Grandmother kept Braydon.  Mother maintained contact with Braydon and Grandmother.  In December, 2009, Father sued for custody.  Mother defended the case, but on one occasion was unable to get to court and the Father was granted custody.  Mother was granted supervised visitations and was Ordered by the Juvenile Court [of Madison County] Judge by Order of February 11, 2011, to take a hair follicle test [for illegal substances].  Mother did not take the test, mainly because she could not pass it according to her statement.  Mother's visitations were to be supervised if she did not take the test, or did not pass it.  They were to be unsupervised if she did pass it.  Mother was involved with drugs at that time and made "bad choices".  Mother had supervised visitations, but had no job and no vehicle. She was financially bankrupt during this period and walked to the last visitation at CASA, a distance of approximately ten miles.  CASA had been set up to supervise the visitations for three months

---

[4] The trial court incorporated its June 2014 memorandum into its August 2014 order.

[5]To protect the privacy of the minor child, we substitute the names included in the trial court's order with the relationship of the individuals referenced.

4

and terminated the supervision thereafter.  Mother was unable to get an attorney to seek reinstatement of her visits.

Mother had no visitations or significant contact with Braydon between April, 2011 and December, 2011.  She called and wrote letters, but only had Grandmother's phone number and address and received no responses most of the time.  Mother sent letters to Braydon through Grandmother, but got no response.  Exhibit 4 were copies of letters sent October 26, 2011, November 25, 2011, November 29, 2011, December 2, 2011, and December 22, 2011.  Most of the letters were to Braydon and sent through Grandmother.  One letter was to the Father and his Wife, and Grandmother, dated October 26, 2011.  In the letter, Mother stated that she had cleaned up her problems with drugs and with courts and had a job.  Mother sought forgiveness for her past actions and to be able to see Braydon and give him a gift she had for him.  Mother asked for a response and furnished her phone number and address in Jackson.  Grandmother acknowledged receiving the letters, but did not show them to Braydon.  She did show them to the Father.  Ultimately, the Father moved Braydon and his Wife to Mississippi and Grandmother was aware of this, but did not tell Mother, or that Father had married.  Grandmother testified that Father's attorney told her not to respond to the letters Mother sent to Braydon, to Grandmother, or to the Father.  Grandmother denied getting phone calls from Mother in 2011 and 2012.

It is undisputed that Braydon is doing well in Father's home in Walnut, Mississippi and doing well in school.  It is undisputed that Mother is now drug free and fully employed as a shift manager at the Pilot Center in Jackson.  Mother produced undisputed evidence that she had passed two hair follicle tests in June and September, 2013.  Mother's Husband is currently employed at U.S. Farathane in Jackson and they have an adequate home.  Mother is still involved in counseling with Pathways, and is prescribed two medications which she takes regularly and as directed.  Mother testified she made several bad choices during a short period in her life after Braydon was born and her finances were really bad.  She pointed out her Husband . . . stuck with her through her adversity and that she was able to pull herself up by her own bootstraps to get rid of her drug addiction.  She testified further that she had moved around several times because of a lack of money to pay rent and living expenses.  It is unrebutted that Mother has paid all of her fines and restitution, or arranged to do so, and that she has not used marijuana since February or March of 2013.

Father moved out of Grandmother's home and purchased a trailer, apparently located on his grandparents' property, in 2009.  Father and Stepmother then relocated to

Stepmother's parents' home and then to Walnut, Mississippi, in December 2012. The trial court found,

> Father . . . moved with Braydon several times after he got custody, but never advised Mother where he lived. Father also was aware of the letter Mother wrote in November and December, 2011, just prior to the beginning of the relevant period, but did not make Braydon aware of the letters, although he testified that Braydon knew [Mother] was his Mother. Father also did not call Mother after receiving the letters, although Mother furnished him her telephone number.

These facts are not disputed.

As defined by the Tennessee Code, abandonment for the purposes of terminating parental rights means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tennessee Code Annotated § 36-1-102 (1)(A)(i) (2014). It is undisputed that Mother did not visit Braydon for the four months immediately preceding the filing of Appellants' petition. The trial court determined, however, that Mother did not willfully abandon Braydon. The trial court stated:

> Mother demonstrated that she was writing letters to the child and Father in the two months immediately prior to the beginning of the relevant period. She was sending those to Grandmother since she had no address for Father and Father did not advise her of his move to Mississippi. Grandmother knew the Father's address and made him aware of the letters, but neither responded to the Mother. Thus, they knew Mother was requesting time with the child and had furnished her address and telephone number. Mother testified that she was embarrassed and felt guilty about her previous bad acts, and failure to maintain contact with the child and did not push the issue during the relevant four month period. Mother was essentially begging forgiveness and seeking any contact with the child that the Father would allow her to have. The Father did not respond and waited out the four month period and then filed to terminate her parental rights.

6

In their brief, Appellants assert that the trial court erred by determining that Mother's failure to visit was not willful where "[Mother] never provided a clean hair follicle test which is all it would have taken to resume her visits." They further assert that Mother "failed to make any effort to reestablish visitation or pay support for sixteen months before the petition was filed." We note, however, that Mother's failure to provide a clean hair follicle test impacted only her ability to exercise unsupervised visitation with Braydon. As the trial court noted, Mother had a right to supervised visitation, and she clearly had a right to maintain contact with Braydon. We agree with the trial court that Father simply "waited out the four month period" before filing his petition to terminate Mother's parental rights.

"[A] parent who attempts to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H*, 215 S.W.3d 793, 810 (Tenn. 2007). Further, a petitioner alleging abandonment as a ground for termination of parental rights carries the burden to prove by clear and convincing evidence that the "parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citation omitted). In this case, Mother actively attempted to maintain contact with Braydon. In her letters, including one addressed to Father and Stepmother, Mother wrote, "I ask you please, I beg you for just a picture and a letter." Mother included her telephone number but received no reply. Additionally, the trial court found that Mother had no vehicle and was unemployed for much of the time prior to May 2012. It further found that she was not financially able to retain an attorney to seek reinstatement of her supervised visits. We agree with the trial court that Appellants failed to carry their high burden to demonstrate, by clear and convincing evidence, willful abandonment for failure to visit.

We also agree with the trial court that Appellants failed to carry their burden to demonstrate abandonment for the willful failure to support. "A party seeking termination of parental rights must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id*. at 641 (citation omitted). The trial court in this case found:

> Mother testified extensively as to her financial difficulties after she became pregnant with Father's child, and losing her job over that. Mother had problems finding a place to live and work. Mother had no transportation for extended periods of time. Father paid child support to the Mother,[6] but was significantly in arrears at periods of time, although he ultimately did pay up. The lack of timely support had an adverse effect on Mother's

---

[6]The permanent parenting plan entered into by the parties in 2008 set Father's child support obligation at $139.00 per month.

ability to pay her daily living expenses. Mother made a mistake becoming involved with drugs and this resulted in legal problems. Mother did not take the Court Ordered drug test, which would have allowed her unsupervised visitations because she had no money to pay for it according to her testimony and also knew she could not pass it. Mother was without counsel after that and felt she needed an attorney to go to court because of what she was told at Juvenile Court, but she had no money to hire an attorney.

The court concluded:

Considering the Mother's financial history, it is understandable to the Court that she did not pay money support during the relevant period. Given her lack of income and lack of any significant family support and no transportation for long periods of time and the lack of response to the letters and inquiries, the fact Father did not tell her where the child lived, and the fact that Grandmother, her only contact did not respond, it is understandable then that she failed to effect a visitation during the relevant period and failed to provide money support.

As the trial court noted, there was no child support order in place requiring Mother to pay child support, Father never petitioned for support, and the 2008 parenting plan required Father to pay child support to Mother. Additionally, as we noted above, the order entered by the juvenile court in February 2011 continued the proceedings adjudicating the matter of custody and visitation. The trial court noted that the lack of a court order is not a valid excuse for not paying child support, but found that Mother had ongoing financial difficulties, no transportation, and lacked employment for most of the relevant period. The court noted Mother's acknowledgment that, after Braydon was born, her finances were "really bad" and she made several "bad choices." The trial court found:

[Mother's] 2012 tax return shows she had income from Bio Blood Components, Inc. of $8,704.00. Mother did not obtain this employment until May, 2012 which was about the time the Petition was filed. There is no evidence of her income prior to then during the relevant period, other than she was unemployed. Since Mother made a prima facie case of lack of ability to pay during the relevant four month period, the burden of proof shifted to the Father to show she had such ability.

The trial court concluded:

The Court is mindful of all the Mother's missteps during a time prior to the relevant period, but the evidence fails to clearly and convincingly show a

8

conscious disregard or indifference to the child. Mother put the child where he would be cared for during the time Mother was not physically, emotionally, or financially able to care for him. When she got herself straight and attempted to reestablish contact with the child, she was ignored. This rebuts the proposition that she had a settled purpose to abandon the child and forever relinquish her rights, duties and obligations to the child. There is no clear and convincing evidence of abandonment.

We agree with the trial court's determination that Appellants did not carry their heavy burden to demonstrate willful abandonment by clear and convincing evidence in this case.

## Holding

In light of the foregoing, we affirm the judgment of the trial court. Because Appellants have failed to carry their burden of proof to demonstrate a statutory ground for the termination of Mother's parental rights, it is unnecessary to address the trial court's finding that termination of Mother's parental rights is not in Braydon's best interests. Costs on appeal are taxed to the Appellants, Father and Stepmother, and their surety, for which execution may issue if necessary. This matter is remanded to the trial court for enforcement of the judgment, including the development of a parenting plan as set forth in the trial court's August 6, 2014, order, and for the collection of costs.

_____
ARNOLD B. GOLDIN, JUDGE